[Civ. No. 46034. Second Dist., Div. Three. Aug. 25, 1976.]

THE PEOPLE, Plaintiff and Respondent, v.
BESTLINE PRODUCTS, INC., et al., Defendants and Appellants.

## COUNSEL

Humphreys, Berger & Pitto, Donald A. Drumright, Cotchett, Hutchinson & Dyer, Joseph W. Cotchett, Meis & O'Donnell, Owen P. O'Donnell, Gallucci, White & Kelley, Thomas E. White and Irving Reifman for Defendants and Appellants.

Evelle J. Younger, Attorney General, E. Clement Shute, Assistant Attorney General, Herschel T. Elkins and Michael R. Botwin, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**POTTER, J.**—Appellants Bestline Products, Inc. (hereinafter "Bestline Products"), Bestline Corporation (hereinafter "Bestline Corp."), William E. Bailey, Robert W. Depew, David L. Eastis, James Rohn and Larry D. Huff appeal from a judgment dated December 21, 1973, in favor of plaintiff the People of the State of California. The judgment (1) permanently restrained defendants from operating or participating in a marketing program embodying proscribed features which the court found were in violation of Business and Professions Code section 17500[1] prohibiting "untrue or misleading" statements; (2) required defendants Bestline Products, Bestline Corp., and Bailey to offer to make restitution to victims of the Bestline marketing program, and (3) imposed civil penalties of $1 million jointly and severally, upon defendants Bestline Corp. and Bestline, Inc., $250,000 upon defendant Bailey, $100,000 upon defendant Eastis, and $50,000 each upon defendants Depew, Huff and Rohn.

---

[1] Business and Professions Code section 17500 reads as follows: "It is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services, professional or otherwise, or anything of any nature whatsoever or to induce the public to enter into any

The complaint which was filed May 12, 1971, included two causes of action. The first cause of action charged that defendants "have operated, and continue to operate, their marketing program by means of making numerous false and misleading representations at 'opportunity meetings' and at other meetings to which the members of the public are invited" and alleged that "[t]hese untrue misrepresentations include, *but are not limited to,* representations relating to the amount of income which can reasonably be anticipated . . . the ease with which persons can earn large amounts of money, . . . the number of successful persons in the marketing program, and . . . the guaranteed success based upon substantial retail sales of the product to the public." (Italics added.) Various specific false representations were described, allegedly made during the conduct of defendants' marketing program from January 14, 1971, to the date of the complaint. The January 14, 1971 date was the date of a consent decree in action No. 952969 in the Superior Court of the State of California for the County of Los Angeles. This decree enjoined defendants Bestline Products, Bestline Corp., Bailey and Depew from operating a marketing program embodying features therein proscribed and from making certain categories of misrepresentations. It also required disclosure of its terms. The consent decree was attached to the complaint as an exhibit.

Among the specific misrepresentations charged were descriptions of the Bestline marketing program as offering to prospective distributors the expectation of a large annual income as a result of their recruiting additional distributors who would in like fashion bring in further recruits. The first cause of action further specified as misrepresentations the giving of nonrepresentative examples of income generated in various levels of distributorships, misstatements relating to the ease with which additional distributors could be obtained, and as to the level of retail sales.

obligation relating thereto, to make or disseminate or cause to be made or disseminated before the public in this State, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, any statement, concerning such real or personal property or services, professional or otherwise, or concerning any circumstance or matter of fact connected with the proposed performance or disposition thereof, which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading, or for any such person, firm, or corporation to so make or disseminate or cause to be so made or disseminated any such statement as part of a plan or scheme with the intent not to sell such personal property or services, professional or otherwise, so advertised at the price stated therein, or as so advertised."

The second cause of action charged that defendants were engaging in conduct "constituting acts of unfair competition" made enjoinable by Civil Code section 3369.[2] As acts of unfair competition, the second cause of action specified defendants' violations of the consent decree of January 14, 1971; plaintiff's theory being that business practices prohibited by such injunction were thereby made "unlawful." Also specified as unfair competition was defendants' operation of their distribution program comprising an "endless chain" scheme prohibited by Penal Code section 327,[3] the violation of this section being also relied upon to make defendants' business practices "unlawful." The unfair competition charges were stated as an alternative basis for injunctive relief, there being no provision for civil penalties for unfair competition at the time the complaint was filed.[4]

The trial commenced October 27, 1972, and 39 court days were consumed in the presentation of evidence and argument. In the presentation of the People's opening case, the 1971 consent decree was received in evidence and both documentary evidence and testimony were received, fully detailing the Bestline marketing program. This program entailed the distribution of household cleaning products manufactured and sold by Bestline Products through an organization comprising a very large number of distributors in three categories. The local distributors, whose function was to make direct sales to the consuming public, purchased Bestline products from direct distributors or general distributors. Generally, they worked part-time and sold through house-to-house or business-to-business canvassing and through giving parties in their homes. The basic discount of the local distributor was 30 percent. An additional discount in the form of a rebate based

---

[2]Civil Code section 3369, subdivision 2, provides: "Any person performing or proposing to perform an act of unfair competition within this State may be enjoined in any court of competent jurisdiction."

Subdivision 3 defines "unfair competition" as follows: "As used in this section, unfair competition shall mean and include unlawful, unfair or fraudulent business practice and unfair, deceptive, untrue or misleading advertising and any act denounced by Business and Professions Code Sections 17500 to 17535, inclusive."

[3]Penal Code section 327 provides: "Every person who contrives, prepares, sets up, proposes, or operates any endless chain is guilty of a misdemeanor. As used in this section, an 'endless chain' means any scheme for the disposal or distribution of property whereby a participant pays a valuable consideration for the chance to receive compensation for introducing one or more additional persons into participation in the scheme or for the chance to receive compensation when a person introduced by the participant introduces a new participant. Compensation, as used in this section, does not mean or include payment based upon sales made to persons who are not participants in the scheme and who are not purchasing in order to participate in the scheme."

[4]Civil Code section 3370.1, authorizing civil penalties, was not enacted until 1972.

upon volume, over $149 per month, was also payable to local distributors.

The next level above the local distributor was the direct distributor. The direct distributor purchased products from Bestline Products and sold them either to local distributors or directly to the public. The direct distributor purchased from Bestline at a 52 percent discount. There was, therefore, a maximum of 22 percent profit on their sales to local distributors (depending upon the rebate earned by them) and 52 percent profit on their personal sales directly to the consumer. There were slight variations in the requirements to become a direct distributor, depending upon the time interval involved. One method was the "work-in." By selling approximately $5,000 retail value of merchandise in one calendar month, a local distributor could become a direct distributor. Far more commonly, however, direct distributorship status was acquired by "pre-purchase" of an inventory of Bestline products, literature and sales aids for an investment of $3,000 or more.

The top position in the Bestline distribution system was the general distributor who was permitted to purchase Bestline products at a 60 percent discount. This allowed a profit up to 30 percent on resales to local distributors. The general distributor also received commissions and special incentive bonus credit for all sales made through the general distributors' organization. To become a general distributor, a direct distributor was required to recruit another direct distributor, and to either (1) recruit a second new direct distributor, or (2) "create" an additional volume of $5,000 in one calendar month by selling to local distributors or to the consuming public at retail. No commission was paid to the direct distributor on account of his recruitment of the first or second additional direct distributor required to become a general distributor. In addition, to become a general distributor, the direct distributor was required to pay $600 to Bestline Products for a general distributor school which he was not required to attend. Once general distributorship status was attained, commissions were payable upon all prepurchase inventory sold to any additional direct distributors recruited by the general distributor and as well upon such sales to any new direct distributors recruited by any such recruit in order to become a general distributor. When a direct distributor recruited by a general distributor himself became a general distributor, the recruiting general distributor was entitled to a 3 percent overriding commission on the total volume produced by the new general distributor's organization. Thus the

recruitment of a direct distributor produced commissions both for the sponsoring general distributor and an overriding general distributor, should there be one. Since the general distributor's discount was 8 percent more than that of the direct distributor, the sponsoring general distributor received an 8 percent commission on all the inventory purchased by new direct distributors.

The special incentive bonus, payable only to general distributors, was based upon the refund bonus value of the sales made through the general distributor's organization. The volume of sales of inventory to new direct distributors was included in calculating this bonus.

The evidence offered in the People's direct case also showed that the method by which the recruitment of new distributors was accomplished included a regular schedule of so-called "Opportunity Meetings" and "D and G (Direct and General) Meetings" which were staged by Bestline Products, though they were financed in part by monthly charges made to direct and general distributors. The format for these meetings was established by Bestline Products and scripts were provided for the guidance of those conducting the meetings. In addition, sound-motion pictures and narrated still film strips were provided and employed in both types of meetings. The function of the Opportunity and D and G Meetings was to assist Bestline distributors at all levels to recruit new distributors.

The Opportunity Meetings were evening meetings. They included a general introductory narrated film strip presenting the Bestline product line and a like presentation by defendant Bailey explaining the "Golden Opportunities" which participation in the Bestline program offered. The Bailey film strip includes a general description of the three levels of distributors and the introduction of one distributor in each category. First, an attractive housewife describes her experience as a local distributor, telling of a party at which she sold an average of $8.75 in merchandise to each of 10 guests for a profit of $25. She also describes setting up routes to canvass homes and businesses, and tells of making about $100 per month. She introduces her direct distributor. He describes himself as having no college education or special training and states that he was just getting by before becoming a Bestline distributor. He claims that becoming a Bestline direct distributor was the greatest thing ever to happen to him and states that if a direct distributor has "just" 10 local distributors, each of which does "only" $700 volume per

month, the resulting profit is $630 per month. The direct distributor then introduces a general distributor who explains that the general distributor receives an 8 percent commission for his services in training and supervising direct and local distributors. He asks the audience to assume that each of them is a general distributor who "only" has four direct distributors, each of which has an organization of 10 local distributors doing $700 volume per month, and points out that this produces $560 commissions with respect to each direct distributor's volume, or $2,240 per month income to the general distributor. He opines that the earning capacity of a general distributor seems "unlimited." Defendant Bailey represents that the testimonials of the distributors dramatize what has been done and can be done if the audience is willing to put the necessary effort into it, and indicates that the Bestline program needs hundreds of thousands of distributors; he closes by suggesting that Bestline has a place for anyone who is interested in prestige, independence and retirement.

The audience at the Opportunity Meeting was supplied generally by existing direct and general distributors desiring to benefit from the recruitment of additional local and direct distributors. A variety of methods for attracting prospects to these meetings were suggested by Bestline Products for use by distributors. Manuals detailing the most effective methods were circulated. These advocated the use of various high-pressure methods to entice prospects to the meetings, including distribution of fliers, direct phone calls and personal contact through purported "surveys."

At the conclusion of the Opportunity Meeting, it was suggested that those who were interested in the "big money" should return the following morning for the D and G Meeting. The D and G Meeting included showing a sound-motion picture starring defendant Bailey and entitled "Growth to Greatness." In that film Bailey is portrayed as addressing what appears to be an Opportunity or D and G Meeting like the one at which the film is shown. He proclaims that the meeting could be "your start to greatness." The listener is invited to define in his own mind the "greatness" he seeks to achieve. He is challenged to have the courage to announce to doubters, and mean it, when he states that he is going to make $25,000 in the next 12 months. Bailey quotes Disraeli to the effect that no force in the world can resist the human will. Though he acknowledges that the results described cannot be achieved overnight and will require total commitment, Bailey assures the audience that "an

amazing number" of people have achieved financial independence by becoming Bestline distributors. At this point, defendant Eastis is shown passing out the special incentive bonuses at which appears to be an annual Bestline meeting for the purpose. One couple announces that their $9,000 bonus check plus a Buick Riviera were the results of only nine months' effort. Another recipient of a $9,000 bonus announces that it is the result of three months' work, and a third bonus recipient receives a $12,000 check and announces that what Bestline has given to him it can give to all of you. Defendant Bailey then resumes the narrative and states that even the blindest should be able to see from the proof given that they too can achieve like results.

In addition to the representations contained in the film strips and sound-motion picture, the scripts, manuals and training packets disseminated by Bestline Products advocated additional recruiting techniques. Many of them recommended suggesting to recruitment prospects the setting of personal goals. For example, one such packet states: "Have your notebook available and just jot across the top of it $100,000 and then ask them what they would do if they had $100,000 in the next four to five years," and "[i]f the figure is $40,000 or less tell them, as unbelievable as it is we will show you how to earn this amount by tomorrow morning's meeting [referring to the D and G Meeting]. If it is above $40,000, tell them we can show you how to make $40,000 part-time, but the rest will involve more work on your part. . . ." In the same packet, the recruiter is exhorted to memorize and give to the recruit on scratch paper, "as if it was his own plan," a schedule by which to gauge the success of his future recruiting. This schedule includes recruiting a first and second direct distributor in the first month as well as five local distributors; for the second month, an additional five local distributors and a third and fourth direct distributor; in the third month an additional five local distributors are shown as well as a fifth and sixth direct distributor and the first general distributor. In the fourth month, five more local distributors are shown, a seventh and eighth direct distributor, and the second, third and fourth general distributors.

In a proposed script for the D and G Meeting included in a general distributor's school publication, the use of the following representation is proposed:

"Let me give you an example of the kind of income which can be earned if you're willing to put in the effort. Let's say you did this job that

I've shown on the board, once a month. That is—helped create and develop one General Distributor each month in your organization. Your income for one year would be 12 × $1,200, or over $14,000 in commissions."

The testimony of witnesses who attended specific Opportunity and D and G Meetings showed that numerous additional representations of like character were made by those who conducted the meetings and by individual distributors who participated in them. Tape recordings were also admitted in evidence of numerous such meetings at which like representations concerning the prospect of developing a distributor organization and producing large earnings were made.

According to the testimony of an assistant vice president of Bestline Products, there was a total of 10,259 distributors in California as of September 30, 1972. This included 844 general distributors, 2,660 direct distributors, and 6,755 local distributors. Further statistics as to the marketing organization and the financial returns to the distributors were developed as the result of a statewide survey of the Bestline direct and general distributors made pursuant to stipulation entered into in the course of the trial. A report of the results of the survey was admitted in evidence as a court exhibit. This report showed that during the period January 15, 1971, through November 30, 1972, 3,189 new direct distributors were recruited in California. Of these, 426 (or 13 percent) became general distributors, while the remaining 2,763 (87 percent) remained direct distributors, that is, they failed to recruit two more direct distributors. The sales to the public of Bestline products accomplished by the surveyed distributors were insubstantial. The great majority of them failed to sell as much as the pre-purchase inventory acquired by them as a condition to becoming a direct distributor; 86.1 percent of them sold less than $5,000 retail value and the median was under $3,000. Sales to local distributors were equally insubstantial; 75.5 percent of all the general distributors sold less than $5,000 retail value to local distributors, whereas 98.5 percent of direct distributors sold less than $2,000 retail value to local distributors. This sales performance was apparently not atypical of the total California distribution picture. As pointed out in the reply brief of appellant Bailey, the estimated 1972 California retail sales were $3 million. Bearing in mind that at that time there was a total of 10,259 California distributors, that year the average retail sales per distributor was under $300. Taking into account only the direct and general distributors, of which there were 3,504, retail sales per direct and general distributor were less than $900.

The survey also reported upon the total bonuses and commissions received by general distributors in the group surveyed. The total special incentive bonus commissions and overriding commissions earned by the general distributors was equally disappointing; 80.7 percent received less than $5,000 in commissions and bonuses, and the median was less than $1,000. When only those who had an average of 16 months' experience were considered, the median was $2,000. Taking into account the fact that direct distributors who did not become general distributors received no bonus or commission, and that 221 of the 426 general distributors received less than $1,000 in commissions and bonuses, it appears that 93.9 percent of all those who became direct distributors in order to participate in the "big money" made less than $1,000 in commissions and bonuses. It was thus apparent that rather than achieving the financial independence and high income which the defendants' promotional material suggested would be their reward, most of the new direct and general distributors did not even recoup the investment they made to acquire the initial inventory.

As the trial progressed and during the People's case in chief, counsel for the People explained on several occasions the posture in which Penal Code section 327 was raised in the second cause of action. He explained in this connection that the function of section 327 was to render unlawful the chain scheme, thereby making it an "unlawful . . . practice" within Civil Code section 3369 and enjoinable as such, and that the violation of section 327 was "not a separate cause of action," and "[i]t is violation of [section] 3369 that we are talking about." Counsel for the People further stated, "[W]e are also alleging violation of Section 327 and that is also only in the second cause of action and it is very important because that is unlawful, that is, violation of Penal Code section 327 is unlawful and based upon a company's engagement in that practice they can be enjoined . . . ." None of counsel's statements in this respect, however, suggested that the fact defendants' marketing program constituted a chain scheme (independently of its constituting a violation of Pen. Code, § 327 as such) was not relied upon as justifying relief under the first cause of action. The fact that it was a chain scheme, without the statement of that conclusion, was fully alleged in detail in the first cause of action in which were set forth the representations allegedly made by defendants to prospective direct distributors to the effect that they would, as general distributors, earn $15,000 per year for part-time employment through recruiting additional direct and general distributors to whom inventory sales would be made. The complaint thus clearly stated that the chain scheme aspect of defendants' marketing program contributed significant-

ly to its deceptive character made actionable under section 17500 of the Business and Professions Code, regardless of whether the program was also rendered "unlawful" by virtue of its constituting a violation of Penal Code section 327.

After the People's case in chief had been presented, defendant Eastis was called as a witness for defendants. Eastis, who was president of Bestline Products, was questioned concerning the existence of a draft of the proposed consent decree which was rejected by the defendants in the prior injunction suit. The apparent purpose of this line of questions was to attempt to establish that defendants interpreted the consent decree in a fashion which made their post-decree marketing practices in compliance therewith; in other words, that they had in good faith attempted to comply with it. Counsel for the People objected to this evidence, though he did not question the admissibility of the witness' testimony as to how he understood the language of the decree. The objection was directed specifically to evidence of the settlement negotiations out of which the consent decree arose. The court ruled that the evidence was inadmissible. The reason given for the ruling was, however, obscure. The court stated that the basis for the ruling was his belief that the first injunction was no longer relevant, the court saying in this respect:

."Actually I don't see where the language of the first injunction means something else. Actually I don't see where the language of the first injunction has any relevance here at this time. It seems to me if the People sustain their case it is going to be a, there is going to be a new injunction and the old injunction would become moot. The People are not asking for any penalties for violating the first injunction. They are not asking for anybody to be held in contempt of the first injunction. They are asking for a new injunction and civil penalties. Actually I don't see where the first injunction comes in here."

Stating its ruling, the court said:

"THE COURT: Well, I am going to rule at this time anything that is relating to the first injunction other than the fact it was or was not made known to the people or to Bestline or the people who attended the meetings of which testimony has already been received, that this will be inadmissible."

At this point, counsel for defendant Eastis moved the court to dismiss the second cause of action. Argument ensued in which counsel for the

People pointed out that defendant's conduct with respect to the injunction was relevant as bearing upon the civil penalties and restitution which might be imposed under the first cause of action. When counsel for defendant Eastis then suggested that evidence other than testimony with respect to negotiations bearing upon defendant's attempt to comply with the injunction would not be excluded, the court stated: "I don't think that is material." The court then commented further that it could see no purpose served by the second cause of action since it did not ask for any relief not available under the first cause of action. When pressed by defendants to dismiss the second cause of action, the court stated the motion to dismiss "will be granted on the grounds that the second cause of action fails to state facts sufficient to constitute a cause of action." When counsel for the People attempted to clarify the order as being based upon the failure of the second cause of action to "state a cause of action which adds anything to the first cause of action in which relief can be granted," the court merely added: "There is one cause of action and if you can sustain it I think you have got everything." With this comment, the subject was closed.

The examination of defendant Eastis who, according to his counsel, was "the company officer who has the most direct information as to what was done in an attempt to comply with that judgment" shifted to other topics and no further effort was made by defendants in the course of the examination of defendant Eastis on that occasion to support any claim of a good faith effort to comply with the consent decree. During the course of that examination, however, defendants did place in evidence through defendant Eastis' testimony the changes in the marketing plan made subsequent to the filing of the complaint, in spite of the fact that there was no amendment to the complaint covering such activities.

In this connection, the court advised that "in regard to the penalty," "whatever goes into evidence even though it is not covered by an amendment to the pleadings and is considered by the court can be made part of the judgment." Thereafter, defendant Eastis testified at some length concerning the Bestline marketing plan which was currently in effect at the time of the trial, and defendants rested.

During the course of the People's rebuttal case, the report of the court-ordered survey of distributors was received in evidence as was the testimony of People's witnesses detailing some of defendants' business practices subsequent to the filing of the complaint. Danny Pierce, a Bestline general distributor, was one of these witnesses. Part of Pierce's

testimony related to his attendance at a meeting on January 29, 1973 (while the trial was in progress), conducted by defendant John Wolfe. This was a "special rally" to inform existing distributors of changes in the marketing plan. The witness testified that Wolfe mentioned the fact that some of them might be receiving questionnaires and requests for interviews from the firm conducting the court's survey. He explained that this was part of a trial that was being brought by that "mealy mouth knock kneed Attorney General." Concerning their responses to the inquiry, Wolfe allegedly advised:

" 'Since you are not accountants or bookkeepers I am sure you will not have that information at hand. You all know what they are trying to do to us, but I want you to keep your answers honest, but be sure they are on the high side when it comes to selling soap.' "

According to Pierce, Wolfe also assured the audience that the trial in progress was nothing to worry about. At the time this testimony was given, it was apparent that the witness had available to him and had made reference to notes in which he had recorded verbatim the comments made at the January 29, 1973 meeting.

Pierce also testified concerning various other meetings and the receipt from Bestline of instructional material including recommendations for use of deceptive practices. One such meeting occurred in August 1972, and was presided over by a Bestline vice president named Soto. The audience included 15 to 20 area coordinators and regional directors in Northern California and Southern California. Richard J. Grillo, Esquire, who was then acting as counsel for Bestline Products, warned that the use of dollar amounts in fliers seeking to attract prospects to Opportunity Meetings should be eliminated. After Mr. Grillo left, Soto allegedly said: " 'That son of a bitch's job is to handle the legal fight. I run this area. I will do it my God damn way or we won't do it at all.' " Soto then provided those present with a form of flier mentioning earnings from $100 to $800 per month.

The witness also testified that in late 1971 or early 1972 he was advised by Soto to make false representations as to the amount of his special incentive bonus when called upon by speakers at Opportunity or D and G Meetings which he attended.

During the cross-examination of Pierce, defense counsel requested examination of the notes to which the witness had referred in his

testimony concerning the January 29, 1973 meeting. The witness was unable to locate them and though counsel for the People was able to account for all the other notes referred to by the witness, those relating to that particular meeting could not be found. Defendants moved to strike the testimony of the witness relating to what occurred at this particular meeting of January 29, 1973, pursuant to Evidence Code section 771, subdivisions (a) and (c).[5]

The court noted that the documents had been produced at the trial by the witness, and that "when he was testifying about the January 29, 1973 meeting, he was refreshing his memory from notes." The court observed that "counsel could have inquired on voir dire about the notes if they wanted to at that time, but apparently, although we don't have a complete record, apparently they did not." The court added:

". . .Now two days later it turns out the notes are lost or missing, so under Section 771(c) (1) I don't think the Court would be justified to strike his testimony at this time. If when we do have a complete record and something to the contrary shows up that would justify the Court in striking this testimony we will again take it up, so the motion will be denied to strike his testimony without prejudice."

In addition, the court noted the following:

"THE COURT: May I say that what Mr. Wolfe said at this meeting doesn't have any great probative value as to misrepresenting or misleading statements made to the public. *They do have some value to show Mr. Wolfe's*[6]*state of mind, but that is all.*" (Italics added.)

---

[5]Evidence Code section 771, subdivisions (a) and (c) read as follows:

"(a) Subject to subdivision (c), if a witness, either while testifying or prior thereto, uses a writing to refresh his memory with respect to any matter about which he testifies, such writing must be produced at the hearing at the request of an adverse party and, unless the writing is so produced, the testimony of the witness concerning such matter shall be stricken.

". . . . . . . . . . . . . . . . . . .

"(c) Production of the writing is excused, and the testimony of the witness shall not be stricken, if the writing:

"(1) Is not in the possession or control of the witness or the party who produced his testimony concerning the matter; and

"(2) Was not reasonably procurable by such party through the use of the court's process or other available means."

[6]Wolfe was a defendant and was subjected to a $50,000 civil penalty. He did not, however, appeal.

The court's reference to the incomplete record reflected the fact that the transcript of the proceedings relating to Pierce's testimony was not available at that time. Defense counsel did not renew the motion.

At the close of the People's rebuttal, defendants were permitted to recall defendant Eastis for further testimony. He became the concluding witness at the trial, and his testimony on that occasion consumed over 100 pages of transcript. The defendants were thereby accorded an opportunity to present substantial surrebuttal.

Early in defendant Eastis' surrebuttal testimony, defense counsel asked him what steps had been taken to advise distributors of the terms of the consent decree. (Said decree required that "defendants shall disclose, orally and in writing, the terms of this final judgment to all participants and prospective participants . . . .") Counsel for the People objected, and this objection was overruled. Thereupon the witness stated: "We put together what is commonly known as the Bestline Business Opportunity Booklet." This booklet made no reference whatever to the terms of the consent decree, though arguably, certain provisions of the decree were thereby implemented. The witness explained that the decision to deal with the matter in this fashion was made by defendant Bailey, defendant Depew, defendant Eastis and Mr. Diel, "who was at that time our legal counsel." Defendant Eastis was then asked, "What did Mr. Diel tell you that led to that decision?" Counsel for the People advised that if this question were answered, then full cross-examination as to all conversations between counsel and the company on other matters should be permitted. Counsel for defendant Eastis then explained his purpose as follows: "[A]ll I wish to do is establish for this Court the fact that with respect to the issue of intent, these individuals had a bona fide belief in the fact that they were entitled to and should have communicated the terms of the judgment in the way they did." When counsel for defendant Eastis sought to limit the waiver of the privilege to the single item of advice concerning compliance with the disclosure provisions of the agreement, counsel for the People requested that the court set aside the dismissal of the second cause of action. In the course of argument in support of that request, counsel for the People referred to the fact that violations of the consent decree were relevant, "primarily in regard to intent and to show the necessity for the form of the injunction there should be now, . . . ." The court denied the

motion to reinstate the second cause of action and gave as a reason the following:

"Now, it seems to me that regardless of whether or not you have a second cause of action, this former case together with the judgment is before the Court and it is proper evidence that the Court may consider if indeed the defendants having been enjoined by the stipulated judgment actually did proceed to evade it and then it goes to a state of mind which exacerbates the fraudulent aspect that the People have been trying to prove.

"I think it is important on the basis of the state of mind. I think that is already before me. That is why I don't think it is necessary to reinstate it."

At this point, counsel for defendant Eastis withdrew the question, suggesting that the matter would be gone into on defendants' pending motion for instructions in action No. 952969, the prior injunction suit. Then counsel for the People stated that he wished to make it clear that violations of the injunction were to be considered in connection with framing the second injunction and that defendants' conduct of the chain marketing scheme and violation of section 327 of the Penal Code would also be taken into account. The court reiterated that the consent decree and defendants' conduct with respect thereto were "still before the Court." Counsel for the People then repeated his view that defendants' conduct of a chain scheme in violation of Penal Code section 327 was also before the court to which the court responded: "I think that is all before the Court, . . ."

Despite this clear announcement that defendants' violations of the 1971 consent decree were considered by the court relevant to the issue of defendants' fraudulent intent, bearing upon the civil penalties to be imposed and the terms of an effective second injunction, defendants did not question defendant Eastis further on this subject. However, on cross-examination, counsel for the People examined defendant Eastis at length concerning defendants' purported compliance with the 1971 consent decree. This examination included questions concerning several provisions of the decree in respect of which it appeared defendants had done little or nothing to comply.

A number of questions were asked concerning defendants' failure to take any action to implement provisions of the consent decree requiring

that distributors who failed to make reports of retail sales (as the consent decree required they be instructed to do) be suspended. Counsel for defendant Eastis objected to a question asking whether any distributor had been "placed on an inactive status" for failure to submit the reports.

Stating the objection as follows, counsel for defendant Eastis stated:

"MR. GRILLO: Your Honor, I am going to object for the purpose of the record, I think, because I think it is irrelevant. All we are concerned with is intent and good faith. If my objection is overruled, the problem is, your Honor, we are going right back into the difficulty we had before. There is no way the ambiguities created by some of these sections can be cleared up without referring to the prior judgment that was submitted and rejected. The witness testified. Counsel indicated he didn't want to go into that, but if he wants to go into specific areas that are different between the two, I will be forced to introduce—. . . ."

Counsel was interrupted at this point by the court overruling the objection. It is apparent, however, that he was indicating that an unfavorable ruling would require him to reopen the line of inquiry which had precipitated the ruling excluding evidence of the negotiations and the form of rejected drafts of the consent decree. The witness quickly indicated his understanding of the matter by testifying, without objection, on that subject. When asked if he construed the decree as imposing "no responsibility whatsoever other than simply placing this notice in the Business Opportunity Booklet and if no one reported it, it made no difference to the company," the witness responded as follows:

"A  Are you interested in my interpretation on that, sir?

Q  Yes, I am.

A  Before we signed this order there was a proposed order which we reviewed and rejected. In the proposed order, your Honor, all three paragraphs starting on page 4, line 19, on line 21 and on line 29, all three of those items stated in the proposed order that we would be required to do this. In the order that we ultimately signed, the first two (i) and (ii) had been amended to so instruct."

The cross-examination continued for some time. In the course of it, defendant Eastis was examined concerning violations of the prohibition in the consent decree against the use of "any examples" to demonstrate

how earnings could be obtained by a participant in the marketing program which did not represent earnings of "a substantial (defined therein as '40 percent of the participants') number of participants in the community or geographical area in which such representations are made. . . ."

Confronted with one of the scripts for D and G Meetings in 1971 approved by him which contained a passage commencing, "Let me give you an example of the kind of income which can be earned," the witness stated that this did not in his view qualify as an example used to demonstrate how earnings could be obtained and was merely a "mathematical computation."

After listening to several equally untenable explanations, the court indicated its evaluation of the witness' testimony as follows:

"THE COURT: Do you believe that was compliance?

THE WITNESS: Yes.

THE COURT: You really believed that?

THE WITNESS: Yes sir.

THE COURT: All right."

At the conclusion of the cross-examination by counsel for the People, counsel for defendant Eastis asked a question concerning a language change between the draft of the consent decree and the final form in addition to the one which the witness had previously described. This brought out the fact that the language had been changed from "can reasonably anticipate" to "will earn"[7] in the paragraph of the decree prohibiting representations relating to earnings which did not represent earnings of a substantial number of participants. The remaining redirect examination related to the witness' use of notes to refresh his recollection, and no further attempt was made by defendants to establish that defendants had in good faith endeavored to comply with the 1971 injunction.

---

[7]The pertinent language with respect to examples, however, remained "any examples used to demonstrate how earnings can be obtained."

At the conclusion of the oral argument, which consumed several days, the court orally announced his intended decision from the bench. He observed that the Opportunity and D and G Meetings "were all patterned on certain set lines" established by defendants, "carefully streamlined and polished to give the impression that those people who came into the program could make very high income; I mean, $30,000 a year or up, even in their spare time . . ." and that "[t]he impression was given, I am sure, to most people, that it was possible, quite probable, that anyone who joined the program could do this." The court made oral reference to the consent decree and to the fact that after the consent decree was entered, "the corporation and its representatives and all the individual defendants continued practically as they had before in misrepresenting to these prospects who appeared at these meetings . . . and in numerous respects this injunction was either callously violated or callously ignored."

The significance of such violations was indicated by the court as follows:

"The fact that the first judgment has been rendered in this case and has been so grossly violated, has convinced the Court that the defendants never intended to abide by it and that the acts which they committed after the injunction, in misleading and misrepresenting the program to their prospects, was far more—these acts were far more egregious than if they'd never had an injunction previously. In other words, their continued acts of defrauding, misrepresenting to the public, were exacerbated by reason of the fact that they already knew, by reason of the first judgment, how far they could go, but they completely ignored that and went on and continued their violations in the same manner that they had before."

In its oral statement, the court also commented upon the chain scheme aspect of defendants' marketing program. It said in this respect:

"[B]ut where the principal idea of a marketing plan is for the company to make money not by selling the product, but by inducing people to invest in the program and then to persuade them to recruit other persons, rather than to sell their product to the general public, the Court believes that that kind of action should be roundly condemned and punished, where found, and the Court finds that this is what occurred and has occurred during the past three years by all of the defendants here."

Findings of fact and conclusions of law were requested by defendants and those submitted by the People were signed by the court. The court found generally as follows:

". . . All of the defendants, corporate and individual, planned and participated in and furthered a common scheme by means of false, misleading, deceptive and fraudulent representations to induce members of the public to become Direct and General Distributors of Bestline Products, Inc."

The findings recited the entry of the consent decree on January 14, 1971, and described its provisions. In finding No. 22, the court described the Bestline marketing program, including the element of prospects being encouraged to become general distributors by paying in excess of $3,000 for initial inventory, plus training sessions in return for which prospects were to be compensated when they sponsored new direct distributors or a direct distributor sponsored by them in turn sponsored a new direct distributor. Finding No. 22 included the conclusion that defendants' marketing plans "were in violation of Penal Code section 327 and of paragraph 4 of the 1971 injunction in that the plans constituted endless chains as defined in Penal Code section 327 and were marketing programs which offered to a participant compensation which was not based upon sales made by the participant to non-participants or to the consuming public. . . ."

Additional findings specified particular misrepresentations which defendants either disseminated or caused to be disseminated "to tens of thousands of members of the California public" (finding No. 23) as follows:

"A. That distributors could reasonably expect to make 'big money;' that distributors could reasonably expect to earn $250,000 or more in a 5 year period; that distributors could reasonably expect to earn $38,000 a year working part time; that distributors could double or triple their income working part time without interfering with their present employment; that distributors could reasonably expect to earn over $600 per month as Direct Distributors.

"B. That distributors could reasonably expect as General Distributors to recruit and promote one General Distributor per month.

"C. That distributors, if they sought a refund within 90 days, would receive all of their money paid for unsold products, less shipping charges.

"D. That if a distributor tried to succeed in the Bestline marketing program, he would be assured of success."

Fraudulent nondisclosure was also found (finding No. 24) by the court in defendants' failure to disclose the existence and terms of the 1971 consent decree and to disclose the fact that the Bestline marketing program was in violation of Penal Code section 327. Further specific reference to the 1971 consent decree was made in findings (finding No. 30) that defendants "willfully" violated the terms of the 1971 consent decree, "the terms of which they well knew."

As a basis for calculating the amount of civil penalty appropriate to each defendant's participation, the court made several findings relating to the number of victims to which misrepresentations were made by each defendant. With respect to defendants Bestline Products, Bestline Corp., Bailey and Eastis, each was found to have "made or caused to be made some or all of the misrepresentations set forth in paragraphs 23 and 24 to substantially more than 3,000 persons in California." Defendants Depew, Huff, and Rohn were each found to have "made or caused to be made to some or all of the misrepresentations set forth in paragraphs 23 and 24 herein to substantially more than 20 persons in California."

In the conclusions of law, the court concluded that defendants had violated Business and Professions Code section 17500 by the misrepresentations, the nondisclosure, and by the operation of a chain scheme. The court further concluded that a permanent injunction should be issued against defendants and that civil penalties should be assessed against the defendants in amounts specified. Finally, the court concluded that restitution should be ordered for all direct and general distributors who became such on or after January 15, 1971, and who requested it.

On July 25, 1973, a judgment was entered in accordance with the court's conclusions. The relief provided by the judgment included a permanent injunction comprehensively prohibiting defendants' operation of a marketing program constituting a chain scheme, or engaging in any of the other deceptive practices which the court found to have existed. The judgment also ordered defendants Bestline Corp., Bestline Products, Bailey and Eastis jointly and severally to offer restitution,

Bestline Products and Bestline Corp., to be primarily liable therefor. Provision was made for the appointment of a receiver to effectuate the restitution.

Civil penalties were assessed against defendant Bestline Corp. and Bestline Products, jointly and severally, in the sum of $1 million against defendant Bailey in the sum of $250,000, against defendant Eastis in the sum of $100,000, and against defendants Depew, Huff and Rohn in the sum of $50,000 each.

By the time the judgment was entered, a chapter 11 proceeding had been filed by defendant Bestline Corp. in the United States District Court for the Northern District of California and a stay order issued restraining further prosecution of any action or proceeding against it. Shortly thereafter, motions to set aside and vacate the judgment and to enter a new and different judgment were filed in behalf of all of the defendants who are parties to this appeal. Due to the pendency of negotiations looking toward a stipulation for a modified judgment, determination of the motion to modify the judgment was continued from time to time until December 21, 1973. A motion for new trial made by said defendants was denied September 28, 1973.

Prior to the time the court finally acted upon the matter of modifying the judgment on December 21, 1971, a notice of appeal was filed for defendants Huff and Rohn on September 28, 1973, by their then counsel Richard J. Grillo. The last hearing relating to the modification at which Attorney Grillo appeared was the September 20, 1973 hearing at which a modification was made eliminating defendant Eastis from the provision of the judgment requiring restitution and the other modification matters were taken under submission. On November 12, 1973, defendants Huff and Rohn executed a substitution of attorneys whereby Grillo was replaced by Irving Reifman. The continuances after September 20, 1973, were in each case effected by notice to counsel in court at the time the continuance was made. Neither Attorney Grillo nor his replacement was present in court later than September 20, 1973, and neither of them was otherwise notified of the continuances which occurred subsequent to Grillo's filing of the notice of appeal.

On December 21, 1973, the court approved a modified judgment which adopted a plan for restitution that had been agreed upon between the People and defendants Bestline Products and Bestline Corp. Pursuant to the agreement for restitution, Bestline Products and Bestline

Corp. transferred funds totaling $3,970,495.75 into an irrevocable trust for the benefit of distributors entitled to restitution and agreed to make further restitutory payments to the trustee in accordance with a schedule set forth in the agreement. The modified judgment deferred application of the provision for a receiver so long as there was no default in the making of the deposits for restitution, and further deferred the payment of civil penalties by Bestline Products and Bestline Corp. until completion of restitution.

Thereafter, appeals were filed by defendants Bestline Products, Bestline Corp., Bailey, Huff and Rohn (second notice) from the modified judgment. The remaining defendants relied upon the September 28, 1973, notice of appeal from the original judgment.

On January 4, 1974, a stipulation was entered into between the People and defendant Bailey, pursuant to which the People agreed to accept $750,000 in full accord and satisfaction of defendant's liability for restitution and in return for such payment and the payment of the $250,000 civil penalty, the People waived costs against defendant Bailey. Said stipulation specifically provided that it did not constitute an admission by defendant Bailey of the correctness of any findings of fact or conclusions of law and did not constitute a waiver of his right to appeal, except "that in no event will defendant Bailey be entitled to reimbursement of the $750,000 paid as restitution or the $250,000 paid as civil penalties." Pursuant to the stipulation, Bailey paid a total of $1 million and received partial satisfaction of judgment as to the provisions of the modified judgment imposing liability for restitution and civil penalties upon defendant Bailey.

## CONTENTIONS

In all, there are seven separate contentions raised by the various appealing defendants. Some of these contentions are urged by all the defendants, whereas other contentions relate to a single defendant or group of defendants. The contentions and the defendants raising them are as follows:

1. All defendants contend that in view of the trial court's order made during the trial dismissing the second cause of action, the issue of violation of the 1971 consent decree was eliminated from the case and it was error for the court to make findings that said decree was violated, or to base any relief thereon.

2. All defendants contend that in view of the order dismissing the second cause of action, any issue as to violation of Penal Code section 327 was removed from the case, and it was error for the court to make findings that such violations occurred, or to base any relief thereon.

3. All defendants contend that the court erroneously denied the motion to strike the testimony of the witness Danny Pierce on the ground that his notes were not produced.

4. Defendants Bestline Corp., Bestline Products and Bailey each contend that they were erroneously held vicariously liable for the tortious acts (misrepresentations) of others who were not their agents. The other defendants simply adopted their contentions.

5. Defendant Bestline Corp. contends that it was improperly found to be a participant in the Bestline marketing program solely by virtue of its status as a holding company of Bestline Products.

6. Defendants Bestline Corp. and Bestline Products each contend that the findings do not support the imposition of the $1 million civil penalties against them.[8]

7. Defendants Rohn and Huff contend that the court was without power to modify the judgment without their consent after the notice of appeal was filed.

The People contest all of the above contentions and maintain that the judgment is in all respects proper. We agree.

### THE ISSUE OF DEFENDANTS' VIOLATION OF THE 1971 CONSENT DECREE WAS PROPERLY TRIED AND DETERMINED UNDER THE FIRST CAUSE OF ACTION

If the trial court's ruling dismissing the second cause of action had eliminated from the case any issues as to violations of the 1971 consent

---

[8]Defendants Rohn and Huff adopt by reference and incorporate the argument made by defendant corporations in this respect. It does not appear that the argument incorporated, however, makes any reference to the $50,000 penalty assessed against each of these defendants. We assume, therefore, that appellants Rohn and Huff are simply adopting the corporate defendants' argument concerning the inadequacy of the findings in general and the propriety of applying a "per victim" test.

decree, appellants would, of course, be correct in their assertion that it was error for the court to make findings and to base any relief upon findings that such injunction was violated. Where an issue is removed from a case, it is error even to receive evidence which is material solely to the excluded matter. (*Fuentes* v. *Tucker,* 31 Cal.2d 1, 5 [187 P.2d 752].) Further, if, as defendants contend, the ruling dismissing the second cause of action reasonably led them to believe there was no need to meet charges that they had violated said injunction, and in reliance upon such belief they had failed to do so, there would be a denial of due process. It does not, however, appear that the dismissal of the first cause of action did, in fact, remove the issue as to violation of the 1971 injunction nor does it appear that defendants were led to forego justification of their conduct in this respect on the basis of the court's ruling.

## VIOLATION OF THE 1971 CONSENT DECREE WAS PROPERLY IN ISSUE UNDER THE FIRST CAUSE OF ACTION

The first cause of action sought injunctive relief to prevent continuing violations of Business and Professions Code section 17500 by deceptive marketing practices of defendants which had been in effect both prior to and after the date of the 1971 consent decree. It also sought the imposition of civil penalties appropriate to deter future conduct of a like nature. Though violations of the 1971 decree were not specifically alleged therein as a basis for injunctive relief, the charging allegations did contain language indicating that the "untrue misrepresentations include, but are not limited to," those specifically described, and the relief sought included imposition of the maximum penalty "for each false and misleading representation made," and "such other and further relief as the nature of the case may require and the court deems proper to fully and successfully dissipate the effects of the false and misleading statements . . . ." Defendants' conduct in respect of the 1971 injunction was, therefore, relevant (1) insofar as any of such conduct constituted misrepresentation, (2) to show what kind of injunctive relief was required to prevent deceptive practices in the future, and (3) to demonstrate defendants' culpability, a factor legitimately considered by the court in assessing civil penalties. It was, therefore, proper and appropriate for the court to make findings as it did that some of defendants' conduct in violation of the 1971 decree was deceptive, in that they did not advise prospective distributors of the existence of and the

terms of the injunction as therein required,[9] nor of their rights thereunder, and that in other respects defendants "willfully" violated the terms of said injunction.

Defendants' argument that the 1971 injunction was void by reason of its uncertainty is not persuasive. Certain provisions of the injunction may, as defendants claim, not be models of legal draftsmanship. However, for defendants Bestline Corp., Bestline Products, and Bailey who entered into a stipulation for the entry of such injunction to claim that it is "so vague that men of common intelligence must necessarily guess at its meaning" (*Pitchess* v. *Superior Court,* 2 Cal.App.3d 644, 651 [83 Cal.Rptr. 35]) and, therefore, void seems wholly inappropriate. Further, those paragraphs of said injunction which the court found had been violated are clear enough that there can be no real question but that the defendants' conduct was in violation thereof. We are not involved here with the requirements for establishing a contempt which, because of its quasi-criminal nature, demands that the terms of the injunction be sufficiently clear that it can be clearly established beyond a reasonable doubt that a violation has been committed. In *Brunton* v. *Superior Court,* 20 Cal.2d 202, 205 [124 P.2d 831], our Supreme Court said: "To hold a person guilty of contempt for violating an injunction, the acts constituting the contempt must be clearly and specifically prohibited by the terms of the injunction. (*Mattos* v. *Superior Court, supra,* at 649 and cases there cited; *American Foundry & Mfg. Co.* v. *Josam Mfg. Co.,* 79 F. (2d) 116, 118; *City of Campbell* v. *Arkansas-Missouri Power Co.,* 65 F. (2d) 425, 427-428.) The party bound by an injunction must be able to determine from its terms what he may and may not do; he cannot be held guilty of contempt for violating an injunction that is uncertain or ambiguous (Ibid.), just as he may not be held guilty of violating a criminal statute that fails to give him adequate notice of the prohibited acts. (See cases cited in 7 Cal.Jur. 843.)"

The strictures of this rule, however, need not necessarily apply in the context of the case at bench. The question here presented is not whether defendants committed a contempt of the 1971 injunction but whether their conduct with respect thereto justified the imposition of a new

---

[9]Nondisclosure of material facts which are accessible to one party only constitutes actionable fraud. (*Rothstein* v. *Janss Investment Corp.,* 45 Cal.App.2d 64, 68, 69 [113 P.2d 465].) The existence of an injunction enjoining defendants from continuing most features of their marketing program certainly was a highly material fact to anyone contemplating the expenditure of $3,000 to become a part of such program. It is, moreover, apparent that the facts concerning the injunction were not accessible to such prospects unless defendants disclosed them.

injunction more effectively protecting the public against their misrepre-sentations and the imposition of civil penalties further to deter their misconduct.

## DEFENDANTS WERE NOT MISLED TO THEIR PREJUDICE

At the time the court dismissed the second cause of action it contemporaneously sustained the People's objection to the proffered testimony of defendant Eastis relating to the negotiations which proceeded the stipulation for the consent decree. Defendants did abandon that line of inquiry for the time being. Had that been the last word on the subject, there would be merit to defendants' claim that they were misled to their prejudice and on this basis omitted justifying their allegedly violative conduct.

This, however, was not the end of the matter. After the People's rebuttal, including the damaging evidence of the report of the court-appointed survey of distributors, was concluded defendants were permit-ted to recall defendant Eastis, who was their principal witness regarding this subject matter. Early in the direct examination of Eastis, defendants reopened the question of their alleged "bona fide belief" that they were acting in accordance with the 1971 decree. It was brought out that defendants Eastis, Bailey and Depew had discussed the matter with Mr. Diel, corporate counsel, and had decided that the provision of the 1971 decree, requiring that defendants "disclose, orally and in writing, the terms of this final judgment to all Participants and prospective Partici-pants . . ." and "make available on request a copy of this final judgment to any Participant or prospective Participant" was sufficiently complied with by the purported implementation of the substantive requirements of the decree in the Bestline Business Opportunity Booklet. Argument with respect to this line of questioning clearly brought out the court's view that evidence of defendants' state of mind with respect to the consent decree was relevant as bearing upon the form of injunction which should be issued, and because it "exacerbates the fraudulent aspect that the People have been trying to prove."

In the ensuing cross-examination, Eastis testified at length concerning what defendants did or did not do in purported compliance with several provisions of the consent decree. At one point defense counsel threat-ened that this kind of cross-examination would require full-scale examination of the negotiations leading to the consent decree. The

witness took the hint and injected a reference to one of the changes between the draft and the final form of the decree in justification of defendants' interpretation. On redirect, the witness was permitted, without objection, to testify concerning another such change in the draft. But defense counsel did not pursue the matter further. They had, in the meantime, observed the court's negative response to Eastis' efforts to justify patent disregard of the injunctive provisions. It was quite apparent that further efforts in this direction would be fruitless, and it was obviously upon that basis that defendants did not go further into the matter, though they had present and available the principal witness as to defendants' efforts to comply. It does not, therefore, appear that defendants were deprived of an opportunity to defend the People's charges that they violated the terms of the 1971 injunction.

### ■ THE ISSUE WHETHER DEFENDANTS' MARKETING PROGRAM CONSTITUTED A CHAIN SCHEME AS DEFINED IN PENAL CODE SECTION 327 WAS PROPERLY TRIED AND DETERMINED UNDER THE FIRST CAUSE OF ACTION

If the trial court's ruling dismissing the second cause of action had eliminated from the case any issue as to whether defendants' marketing plan constituted a chain scheme, or if such ruling reasonably led defendants to believe there was no need to meet charges that the program was such a scheme, there would be merit to defendants' contentions with respect to this issue. It does not, however, appear that either event occurred.

The chain scheme status of defendants' program was properly in issue under the first cause of action. The first cause of action was based upon defendants' employment of deceptive marketing practices prohibited by Business and Professions Code section 17500. In the first cause of action, the facts showing that defendants' marketing plan was in fact a chain scheme are alleged with particularity. Paragraph 20 B sets forth these facts in the form of what was represented to prospective distributors respecting the manner in which they would "make large amounts of money" by recruiting additional direct distributors, thereby becoming general distributors entitled to commissions upon the prepurchase of inventory by the recruitment of additional direct distributors by themselves or by direct distributors they sponsored. Paragraph 20 B of the complaint thus specifies the deception inherent in the promotion of such a chain as a basis for relief under section 17500. No mention is made in the first cause of action of Penal Code section 327 (making promotion of

any such scheme a misdemeanor), but there was no reason such mention should be made. The deceptive character of such schemes does not depend upon their illegality, even though they have been made a crime because they are deceptive. In basing a charge of deception upon the chain scheme aspect in defendants' marketing plan, the People were simply asserting a widely accepted view that such plans "are inherently fraudulent." This view has been adopted by the appellate courts in several states and by numerous appellate courts in the federal system.

In *Wesware, Incorporated v. State* (Tex.Civ.App. 1972) 488 S.W.2d 844, the Court of Civil Appeals of Texas affirmed a judgment of the trial court enjoining conduct of a chain referral marketing scheme involving the same elements present in the Bestline program. One basis upon which the State contended that the distribution system was a deceptive trade practice was its claim that "the marketing plan of Appellant is a chain-referral or pyramid selling scheme which is inherently fraudulent, unworkable, and patently impossible, and, hence is deceptive per se; . . ." (488 S.W.2d at p. 847.) The court adopted the People's contention in this respect, saying (488 S.W.2d at p. 848):

"The plan or scheme before us contemplates pyramiding one group of sales upon others in a manner that has been roundly condemned and held illegal by both the federal and state courts. See Securities & Exchange Commission v. W. J. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244; Blachly v. United States, 380 F.2d 665 (5th Cir. 1967); Fabian v. United States, 358 F.2d 187 (8th Cir. 1966); United States v. Armantrout, 411 F.2d 60 (2nd Cir. 1969); State ex rel. Turner v. Koscot Interplanetary Inc., 191 N.W.2d 624 (Iowa, 1971); State by Lefkowitz v. I. T. M., Inc., 52 Misc.2d 39, 275 N.Y.S.2d 303 (1966).

"The scheme has also been called a 'referral sales' plan and consequently proscribed as fraudulent conduct. State ex rel. Turner v. Koscot Interplanetary, Inc., *supra,* citing numerous cases in support. It has been held that the fact that the first few participants could possibly earn something is immaterial because, ultimately, the plan will be impossible as a practical matter for the great majority of the public. State v. Lefkowitz v. I. T. M., Inc., *supra.*"

*State by Lefkowitz v. ITM, Inc.* (1966) 52 Misc.2d 39 [275 N.Y.S.2d 303], contains a similar condemnation on like grounds of such programs. A pyramid sales program was enjoined under a law authorizing

injunctions against continuance of fraudulent business activities. The court said (275 N.Y.S.2d at pp. 315-316):

"Depending on the size of the sales force available to respondents, and the territory available to them, somewhere along the line, the plan had to fail as a matter of economic feasibility and mathematical certainty. No matter the junction at which this was reached, the number of latest participants would grossly exceed the sum of the participants of all prior rounds. It is patent that by far the greater number of participants could earn no commissions.

"This is the vice and quicksand nature of 'endless-chain' transactions. And it is so apparent that the promoters must be charged with knowledge of the fraud inherent in it. As was cogently stated in McNamara v. Gargett, 68 Mich. 454, 459-460, 36 N.W. 218, 221, a case involving an 'endless chain' plan:

" 'The very scheme itself bears evidence upon its face that it is a fraud and a snare, and yet so cunningly devised that, in the hands of a sharp, shrewd, and designing man, hundreds of the unwary have been defrauded; and the courts should set their seal of condemnation upon it, and pronounce it, as it is, a contract void on the ground of public policy.'

"Other courts have similarly held. In Wisconsin (Twentieth Century Co. v. Quilling, 130 Wis. 318, 324-325, 110 N.W. 174, 176), the court held:

" 'Such an [endless-chain] enterprise we regard as contrary to public policy and void. Any contract which contemplates or necessarily involves the defrauding or victimizing of third persons as its ultimate result must be contra bonos mores [citing cases in Michigan, Iowa, Indiana, Ohio and Ontario].'

"While the futility of the 'endless-chain' plan is obvious to the promoters, it is not apparent to the consumer participant. That enrollment within the first four rounds can earn commissions is entirely possible and credible. As was said in New v. Tribond Sales Corporation, 57 App.D.C. 197, 19 F.2d 671, 673-674, where an endless-chain scheme which would involve 516,560,852 sales by the fifteenth round was condemned:

" 'While it is unlikely that the chain would progress to such an extent in any locality, it is apparent that the extent to which a chain has progressed in a given locality will have material bearing upon the ability of "contract" holders to dispose of coupons, through the narrowing of the field of possible purchasers. It is practically impossible for a "contract" holder to obtain any advance information in this connection, but the appellee [promoter] is much more advantageously situated in this respect.' "

In *State* ex rel. *Turner* v. *Koscot Interplanetary, Inc.* (Iowa 1971) 191 N.W.2d 624, a marketing scheme whereby purchasers of cosmetics for resale were promised refund payments for each additional such purchaser introduced by them was held to have violated a prohibition against consumer fraud sales practices. In so holding, the Iowa Supreme Court said (191 N.W.2d at p. 630):

"Although the term 'fraudulent conduct' is not subject to a precise definition, it does include 'referral' or 'pyramid' sales arrangements by which people are induced to buy upon the representation they can reduce or recover their purchase price, or earn untold profits by referring other buying prospects to the seller. See The Code, Section 4.1(2); Securities and Exchange Commission v. W. J. Howey Co., 328 U.S. 293, 298-301, 66 S.Ct. 1100, 1102-1104, 90 L.Ed. 1244; Florida Discount Centers, Inc. v. Antinori, 226 So.2d 693, 694-695 (Fla.); M. Lippincott Mortgage Investment Co. v. Childress, 204 So.2d 919, 921-922 (Fla.); Commonwealth v. Allen, 404 S.W.2d 464, 466-467 (Ky.); State by Lefkowitz v. ITM, Inc., 52 Misc.2d 39, 275 N.Y.S.2d 303, 315-327; People v. Federated Radio Corporation, 244 N.Y. 33, 154 N.E. 655, 657; Sherwood & Roberts-Yakima, Inc. v. Leach, 67 Wash.2d 630, 409 P.2d 160, 162-164 (Wash.); 37 Am.Jur.2d, Fraud and Deceit, § 26; 5 Buffalo L.Rev. 669; Annos. 14 A.L.R.3d 1420, 1423.

"VII. But defendants take the position use of the word 'contingent' in § 713.24 (2b) makes the Act inapplicable to them. This stand is apparently premised upon the claim, '* * * contingent upon the procurement of prospective customers provided by the purchaser, or the procurement of sales * * * to persons suggested by the purchaser * * *', means sale of merchandise must, *at time of the sale,* be contingent, and the rebate or payment must be an integral part of such sale or procurement."

The following federal cases express similar views: *United States* v. *Armantrout* (2d Cir. 1969) 411 F.2d 60; *Blachly* v. *United States* (5th Cir. 1967) 380 F.2d 665; *Fabian* v. *United States* (8th Cir. 1966) 358 F.2d 187.

The vice of the chain scheme aspect of the Bestline marketing system upon which the first cause of action was in part based was the inherent deceptiveness found determinative in the above authorities. Since the promised rewards can only result to any level of participants in the pyramid in the event it grows to another level, it is obvious that ultimately the point will be reached where the necessary further recruitment is impossible. The fact that the point of impossibility has not been reached at the time a given recruit is brought in does not alter the fact that there must ultimately be someone deceived—if not the current recruit, some recruits or recruits of recruits who must be induced to participate for the present prospect to succeed.

*Ger-Ro-Mar, Inc.* v. *F.T.C.* (2d Cir. 1975) 518 F.2d 33, relied upon by defendants, is not persuasive to the contrary.[10] By making proof "that some recruiting saturation exists" (518 F.2d at p. 37), a necessary element to establish deception, the court simply overlooks the dilemma last stated. The chain scheme involved in *Ger-Ro-Mar*, moreover, differed from the Bestline scheme in that the rewards to be obtained by recruiting additional distributors depended upon the "combination of their own retail sales and those of their 'personal group' (their recruits and recruits' recruits)." (518 F.2d at p. 36.) The Bestline plan, as alleged in the complaint and found by the court, offered compensation for recruitment based upon sales to the recruits. This element of the Bestline plan, which is what makes it a chain scheme under California law, serves to increase the certainty of deception by diverting the effort of all distributors from retail sales to the sales of distributorships. A pyramid sales plan under which the compensation for recruitment is limited to "payment based upon sales made to persons who are not participants in the scheme and who are not purchasing in order to participate in the scheme," does not come within the definition of endless chain schemes set forth in Penal Code section 327. The section, however, declares the policy of this state that such schemes are deceptive when compensation is offered "for introducing one or more additional persons into participation in the scheme" based upon sale to the person introduced. It is on the basis of this policy that participation in such schemes is made criminal.

[10]The decisions of the lower federal courts are not binding upon this court. (*People* v. *Bradley*, 1 Cal.3d 80, 86 [81 Cal.Rptr. 457, 460 P.2d 129].)

It is thus apparent that the claimed chain scheme character of the Bestline marketing program was a principal issue under the first cause of action to enjoin misleading representations, on the basis that the Bestline program was thereby rendered per se deceptive under the policy embodied in the law of this state. The legal conclusion, however, that defendants thereby committed the misdemeanor described in Penal Code section 327 was not an element of the first cause of action. That evaluation of their conduct was relevant only to the second cause of action, wherein it was relied upon to establish the "unlawful" character of defendants' business practice. The dismissal, therefore, of the second cause of action asserting that conclusion rendered immaterial the conclusion that defendants' conduct constituted the offense but did not affect the materiality of the fact that the Bestline program was by virtue of its embodiment of a chain scheme inherently deceptive.

## DEFENDANTS WERE NOT MISLED BY THE COURT'S RULING

As above pointed out, the complaint clearly sought relief based upon the chain scheme status or element of defendants' marketing program. Much of the evidence received in the People's direct case was directed to showing that though the 1971 consent decree contained prohibitions specifically directed to eliminating this element, defendants had continued offering compensation based upon sales to persons who were purchasing in order to participate in the scheme. No rulings of the court were made at any time in the course of the trial which restricted defendants in any way in the presentation of evidence bearing upon this issue. They tendered no such evidence and they do not in their briefs on appeal suggest what if any evidence might have been available to them in view of the overwhelming evidence presented by the People. Moreover, the court's intent to consider the evidence bearing upon the chain scheme element of the Bestline program was stated during the surrebuttal testimony of defendant Eastis. There was, therefore, no basis upon which the defendants could assume that relief granted under the first cause of action would not be based upon the chain scheme element of the Bestline marketing program.

## DEFENDANTS WERE NOT IMPROPERLY DENIED A JURY TRIAL ON THE ISSUE OF VIOLATION OF PENAL CODE SECTION 327

Defendants argue: "Whether appellants violate Penal Code section 327 should have been determined by a jury in a criminal proceeding."

Appellants' demand for a jury trial was denied on the ground that the relief sought in the complaint was essentially equitable in nature and the fact that imposition of civil penalties might also result did not serve to change the nature of the case. This court affirmed the propriety of proceeding in such matters without a jury in *People* v. *Witzerman,* 29 Cal.App.3d 169, 176-177 [105 Cal.Rptr. 284], where the court said:

"Assuming, without so deciding, that the civil penalties sought represent legal rather than equitable relief, we do not believe that in this case such issues could have been severed from the equitable ones. The same alleged misconduct on the part of appellants was the basis for both types of relief sought by the People. (Cf. *Jaffe* v. *Albertson Co.,* 243 Cal.App.2d 592, 610 [53 Cal.Rptr. 25].) Under these circumstances trial to the court of the People's case for injunctive relief disposed of as well the People's case for relief by way of civil penalties. (Cf. *Veale* v. *Piercy,* 206 Cal.App.2d 557, 562-563 [24 Cal.Rptr. 91].)

"The statutory action before us was not rendered criminal in nature because the People therein sought civil penalties. It is true that a civil penalty is identical in its purpose and monetary effect to a fine. Both are punitive exactions by the government from a person for misconduct imposed to deter such misconduct in the future. But a fine ordinarily carries with it a criminal stigma and much more frequently than not is an alternative punishment to involuntary confinement of the person of the defendant. In other words, in the usual criminal proceeding a defendant faces the peril of the loss of his liberty as well as that of his property. (Cf. *In re Winship,* 397 U.S. 358, 363 [25 L.Ed.2d 368, 375, 90 S.Ct. 1068].) In short, the punitive nature of a civil penalty does not make an action to obtain it completely criminal in nature. (See *Madonna* v. *State of California,* 151 Cal.App.2d 836, 840-841 [312 P.2d 257].) This being so, the right to a trial by jury '[i]n all criminal prosecutions' guaranteed by the Sixth Amendment to the United States Constitution does not apply in this case. (See *United States* v. *Regan,* 232 U.S. 37, 47 [58 L.Ed. 494, 498, 34 S.Ct. 213].) [Fns. omitted.]"

Defendants in this case also have not been found guilty of any crime. The court did find facts which, if found in a criminal trial and beyond a reasonable doubt, would support such a conviction. The findings in this respect were material to the issues presented by the first cause of action and they are of no force and effect except in relation to said first cause of action and except insofar as defendants may be collaterally estopped in some other civil proceedings presenting this same issue.

## ■ Any Error in the Failure to Strike the Pierce Testimony Was Nonprejudicial

It is unnecessary to decide whether the ruling denying the motion to strike the testimony of Danny Pierce was erroneous. The record does not support the court's stated belief that counsel for defendants had the opportunity but did not choose to examine the notes as the testimony progressed. The procedure followed contemplated an opportunity for such examination during the course of cross-examination. On the other hand, there is no explanation in the record for defendants' failure to renew the motion when the transcript of proceedings was available in order to demonstrate this state of affairs. What is clear from the record, however, is that the court did not consider the Pierce testimony which was subject to the motion as being of any probative value on any issue other than that of the state of mind of defendant Wolfe. Defendant Wolfe has not appealed, so prejudice to his case cannot be considered. It is true that the court made reference to Pierce's testimony as persuasive with respect to another matter. But there was no failure to produce notes concerning that testimony. We, therefore, conclude that the error, if any, in the failure to strike this testimony was not prejudicial to the defendants who are parties to this appeal.

## ■ Appellants Have Not Been Held Liable for the Tortious Acts of Others

Defendants Bestline Corp., Bestline Products, and Bailey argue that they have erroneously been held vicariously liable for the tortious acts of others. The remaining defendants simply adopt these arguments without any attempt to demonstrate their applicability. As stated by defendants Bestline Corp. and Bestline Products: "Although the Findings of Fact and Conclusions of Law are not explicit on the point, they irrefutably suggest that Appellants were held liable for the misleading statements and other tortious acts of persons not their agents or employees. The incidence of misleading statements found by the Court to have been caused by Appellants could not have been accomplished by Appellants' employees alone. The clear implication is that Appellants were held liable for the misrepresentations of Bestline distributors made during promotional meetings and elsewhere. (See Findings of Fact 23, 24, and 32-38; C.T. pages 2093-2100)."

A similar assertion appears in the opening brief of defendant Bailey, where it is said: "It is readily apparent that Appellant Bailey's liability is

not based on his own actions, but is rather a derivation from the tortious conduct of others. The only possible theories which would support such liability are (a) an agency relationship between Appellant Bailey and the individuals who committed the tortious acts, or (b) liability based solely upon Appellant Bailey's corporate position." Both briefs then launch into extended discussions of the requirements for the establishment of agency to impose liability on a respondeat superior theory.

The difficulty with defendants' argument is that there is no foundation for their gratuitous assumption that liability was imposed upon them for misrepresentations of Bestline distributors on any such basis.

The court made no finding even remotely suggesting that vicarious liability was imposed. There is no finding that distributors made any of the misrepresentations as agents of the defendants. Instead, it was found that, "All of the defendants, corporate and individual, planned and participated in and furthered a common scheme by means of false, misleading, deceptive and fraudulent representations to induce members of the public to become Direct and General Distributors of Bestline Products, Inc." In addition, each of the defendants was found to have directly participated in the making of such representations in that "each did disseminate or cause to be disseminated" said misrepresentations.

It is thus apparent that the basis upon which defendants were held liable was as conspirators and as persons who participated in the dissemination of the misrepresentations by sponsoring and staging the Opportunity and D and G Meetings at which they were disseminated, and by supplying (a) the scripts used at such meetings, (b) the motion pictures and narrated film strips displayed at such meetings, and (c) manuals and packets which encouraged general distributors and direct distributors seeking recruits to elaborate upon the same deceptive theme.

■ All parties to a conspiracy to defraud are directly liable for all misrepresentations made pursuant to such conspiracy and anyone who knowingly aids and abets fraud or furnishes the means for its accomplishment is liable equally with those who actually make the misrepresentations. In *American Philatelic Soc.* v. *Claibourne,* 3 Cal.2d 689 [46 P.2d 135], this rule was applied in a case involving unfair competition. The court said (3 Cal.2d at pp. 696-697): "To sum up the situation, it is apparent that, if the allegations of the complaint be true, the conduct of respondent in offering for sale these privately perforated stamps will inevitably result in severe pecuniary injury to the appellants, and the

gaining by respondent of an advantage arising out of, in the final analysis, duplicity and dishonesty. The fact that respondent is satisfied to take a small profit, leaving to another the actual fraud, the double-dealing and palming off, is wholly immaterial. He who induces another to commit fraud and furnishes the means is equally guilty. (*Warner & Co.* v. *Lilly & Co.,* 265 U.S. 526 [44 Sup.Ct. 615, 68 L.Ed. 1161].)"

In *Fink* v. *Weisman,* 129 Cal.App. 305 [18 P.2d 961], the same rule was applied in a case of fiduciary fraud. The court said (129 Cal.App. at p. 317): "However, as we have said above, the trial proceeded on the theory that the fifth count involved a conspiracy to defraud Fink while he occupied a confidential relation with Weisman and the jury was instructed on that theory. One who knowingly aids and abets a fiduciary to make secret profits may be held liable jointly with the fiduciary for such secret profits. (*Jackson* v. *Smith,* 254 U.S. 586 [41 Sup. Ct. Rep. 200, 65 L. Ed. 418]; *Lomita Land & Water Co.* v. *Robinson,* 154 Cal. 36 [97 Pac. 10, 18 L. R. A. (N. S.) 1106]; *Victor Oil Co.* v. *Drum,* 184 Cal. 226 [193 Pac. 243]; *Smith* v. *Blodget,* 187 Cal. 235 [201 Pac. 584].)"

■ There was ample evidence to support the court's findings of participation as against each of the defendants. Insofar as defendants Bestline Corp. and Bestline Products are concerned, the finding that they disseminated or caused to be disseminated misrepresentations was fully supported by (1) their continued operation of the Bestline marketing program including the chain scheme element, and (2) their staging of the Opportunity and D and G Meetings in which deceptive motion pictures and narrated film strips supplied by them were uniformly employed and their scripts were followed. It was irrelevant in this connection whether or not the general or direct distributors actually conducting the meetings were agents or employees of the corporations.

Wholly apart from their capacities as corporate officers, defendants Bailey and Eastis clearly were shown to have been active participants in the conspiracy and scheme. For example, each of them appear in the sound-motion pictures and film strips utilized at the meetings. Further, in view of their active participation as executive officers, it is inconceivable that they could have been unaware of the basic framework of the company marketing program and of the content of the scripts, manuals and packets which were disseminated to further its conduct.

Defendants Rohn and Huff conceded their participation in their opening brief where they stated: "[T]hese appellants were responsible for

the format preparation of the Opportunity and the Direct and General Meetings." As heretofore pointed out, conduct of those meetings following that format was the main ingredient of the fraudulent scheme found by the trial court.

We need not discuss the position of defendant Depew who merely adopts other defendants' contentions without attempting to support by reference to the record what the evidence showed with respect to that defendant's participation. The court found that Depew "made or caused to be made the misrepresentations above referred to." Defendant Depew's adoption of the other defendants' argument in this respect is in effect an assertion that there is insufficient evidence to support this finding. It is, therefore, subject to the rule stated by this court in *Gold* v. *Maxwell,* 176 Cal.App.2d 213, 217 [1 Cal.Rptr. 226], where it was said: "In support of his position, defendant makes and variously repeats a number of points which, on analysis, come down to one contention: that the findings are unsupported by the evidence. Such contention requires defendant to demonstrate that there is no substantial evidence to support the challenged findings. (*Nichols* v. *Mitchell,*. 32 Cal.2d 598, 600 [197 P.2d 550].) Defendant completely ignores the rule that where an appellant claims the findings, or a particular finding, is not sustained by the evidence, he is required to set forth in his brief all of the material evidence and not merely his own evidence. Defendant recites only evidence favorable to him and argues the case as though we were the judges of the weight of the evidence. It is well established that a reviewing court starts with the presumption that the record contains evidence to sustain every finding of fact. This defendant has not done. If it is not done, the error is deemed waived. (*Cooper* v. *Cooper,* 168 Cal.App.2d 326, 331 [335 P.2d 983].) We do not search the record to find error."

### ■ DEFENDANT BESTLINE CORP. WAS PROPERLY HELD TO BE A PARTICIPANT

There was no evidence indicating that Bestline Corp. and Bestline Products were alter egos, nor that their relationship was other than that normal to a holding company and its wholly owned subsidiary and, as noted by the court: "There was testimony that its sole function was as a holding corporation for the shares of stock of Bestline Products."

The People's failure to offer any proof with respect to the direct participation of Bestline Corp. in the Bestline marketing program was

justified in oral argument on the basis of admissions in the joint answer of these defendants. That answer admitted in two places that the Bestline marketing program was an activity of both Bestline Corp. and Bestline Products. In paragraph XI of their answer, these defendants admitted "that they are engaged in the manufacture and sale of soap products, that they have a marketing and distribution program involving more than one level . . . ." In paragraph XII of the answer, both defendants "admit that their marketing program consists of different levels of distributors . . . ." These admissions were, moreover, made in answer to a complaint which alleged that both corporate defendants were parties to the stipulation whereby the 1971 consent decree was entered enjoining both defendants in like fashion from the conduct of the Bestline marketing program in the proscribed fashion.

■ Matters admitted in pleadings do not require proof. As this court said in *Gates* v. *Bank of America,* 120 Cal.App.2d 571, 575 [261 P.2d 545]: "A party may not make a contention based on a statement of fact contrary to the admission in his own pleading. (*Bloss* v. *Rahilly,* 16 Cal.2d 70, 77 [104 P.2d 1049]; *Rhode* v. *Bartholomew,* 94 Cal.App.2d 272, 278-279 [210 P.2d 768].)"

We are not unmindful of the rule that doubts with respect to the sufficiency of an admission should be resolved in favor of the pleader. (*Geimann* v. *Board of Police Commr's.,* 158 Cal. 748, 753 [112 P. 553].) ■ We find, however, no uncertainty in the meaning of the admissions contained in the joint answer of the corporate defendants. Bestline Corp. admitted not only that it was engaged in the manufacture and sale of soap products but as well that the Bestline marketing program was both its marketing program and the marketing program of defendant Bestline Products. The trial court thus properly concluded that defendant Bestline Corporation should not be permitted at the conclusion of the trial to contend to the contrary.

Defendant Bestline Corp. also cites the rule that the parties are not bound by admissions in their pleadings "where the case is tried as though no admission had been made." It does not, however, point out in what respect the trial was so conducted, and there is no reason to assume that it was. Rather it appears that in reasonable reliance upon the admission in the answer, the People simply omitted offering evidence which would justify holding defendant Bestline Corp. liable for the acts of its subsidiary. The fact that there was some testimony that defendant Bestline Corp. had no other business besides the business of manufacture

and sale of cleaning products through its subsidiary does not establish that the effect of the admission was ignored during the trial.

### ■ THE COURT'S FINDINGS SUPPORT THE IMPOSITION OF $1 MILLION IN CIVIL PENALTIES AGAINST DEFENDANTS BESTLINE CORP. AND BESTLINE PRODUCTS

Defendants Bestline Corp. and Bestline Products contest the imposition of a civil penalty of $1 million for which they were made jointly and severally liable. First they claim that the findings upon which such penalty is based are inadequate to sustain the imposition of a penalty in that sum, even assuming that the "per victim" test (*People* v. *Superior Court (Jayhill)*, 9 Cal.3d 283 [107 Cal.Rptr. 192, 507 P.2d 1400, 55 A.L.R.3d 191]) is applicable. Secondly, they challenge the propriety of applying the "per victim" test in a situation involving misrepresentations made at large public gatherings. Neither contention has any merit.

The attack upon the findings is based upon an alleged uncertainty in finding No. 32 that defendants ". . . Bestline Products, Inc. and Bestline Corporation each made or caused to be made *some or all* of the misrepresentations set forth in paragraphs 23 and 24 to substantially more than 3,000 persons in California." (Italics added.) The 3,000 persons referred to in this finding are those who, in response to the misrepresentations made at Opportunity and D and G Meetings, became direct or general distributors of Bestline products subsequent to January 15, 1971. Other findings of the court made it clear that "tens of thousands" of prospective victims of the misrepresentations were in attendance at such meetings. The evidence unquestionably supports both findings. The schedule of such meetings and the testimony concerning the attendance at such meetings indicate that the numbers in attendance were many times the minimum of 10,000 found by the court. The fact that some of the persons in attendance may have attended several meetings doubtless was taken into account by the court in determining that figure. Defendants' argument that it is impossible to tell "how many violations described . . . might have been based solely on improper findings" (imposing vicarious liability for representations of agents) is disposed of by our holding that there were no such improper findings.

The findings made by the court are, therefore, adequate to support the imposition of penalties that would be appropriate based upon false and misleading representations having been made to upward of 10,000 prospective distributors, 3,000 of whom in fact acted thereon to become direct or general distributors.

Such findings clearly supported the court's imposition of a $1 million civil penalty. In *Jayhill, supra,* 9 Cal.3d 283, the making of 25 different misrepresentations to individual solicitees in a sales pitch was held to result in one violation per solicitee. The court stated (9 Cal.3d at pp. 288-289): "We determine what constitutes a 'violation' as that term is used in section 17536. The Attorney General contends that each misrepresentation by a defendant constitutes a separate violation subject to a $2,500 civil penalty. As the number of misrepresentations allegedly committed by defendant Jayhill alone is no less [than] 25, under the Attorney General's theory Jayhill would be liable for a $62,500 penalty for each customer solicited if the allegations were proved. While the intent of section 17536 was to strengthen the hand of the Attorney General in seeking redress for violations of section 17500, it is unreasonable to assume that the Legislature intended to impose a penalty of this magnitude for the solicitation of one potential customer. Rather, we believe the Legislature intended that the number of violations is to be determined by the number of persons to whom the misrepresentations were made, and not by the number of separately identifiable misrepresentations involved. Thus, regardless of how many misrepresentations were allegedly made to any one potential customer, the penalty may not exceed $2,500 for each customer solicited by a defendant. [Fn. omitted.]"

Despite the clear language in *Jayhill,* defendant corporations argue: "It is unreasonable to assume that the Court in *Jayhill,* by force of its own investigation of the facts of that case, proposed to establish a test for the determination of Section 17500 violations applicable to all situations." Perhaps so, but there is nothing to suggest that a comparable investigation of the facts in this case makes it unreasonable to find the corporate defendants guilty of at least 3,000 violations and to impose a civil penalty of approximately $330 in respect of each such violation. Defendants Bestline Corp. and Bestline Products extracted over $3,000 each from the 3,000 victims, for a total of $9 million. The fact that they have been obliged to offer restitution which could amount to over

$6 million in addition to the $1 million penalty, does not demonstrate any excess. The reason civil penalties are provided is that some deterrent beyond that of being subject to an injunction and being required to return such ill-gotten gains is deemed necessary to deter fraudulent business practices. The court's application of the "per victim" test in this instance appears wholly reasonable under the circumstances.

## THE MODIFICATION OF THE JUDGMENT WAS NOT IMPROPER IN RESPECT OF DEFENDANTS ROHN AND HUFF

The argument of defendants Rohn and Huff that the court was without authority to modify the judgment, so far as it applied to them, after the notice of appeal and without their consent, assumes, without any demonstration that such is the fact, that "the modification [a]ffected substantial rights of Appellants." Presumably, this means that the rights of defendants Rohn and Huff were adversely affected.

This court has examined in detail each and every provision of the judgment as originally entered and as modified. The major revision made by the modification was the incorporation of the restitution plan which was agreed upon by defendants Bestline Corp. and Bestline Products. This modification had no effect whatsoever upon the rights of defendants Rohn and Huff, since they were not subject to the restitutionary provisions of the decree in the first place. The provisions of the judgment with respect to civil penalties assessed as against defendants Rohn and Huff remained unchanged. The only provisions of the modified judgment which had any bearing whatever upon the rights of defendants Rohn and Huff are the modified injunctive provisions. Though defendants Rohn and Huff, along with the other defendants, are subject to these injunctive provisions, the modifications made therein do not appear to render such injunctive provisions more onerous. Their effect is to clarify and limit the effect of the restraints thereby imposed. This was pointed out in respondent's brief, yet appellants Rohn and Huff make no attempt in their reply brief to demonstrate the contrary. We, therefore, see no reason to confuse the situation by having two different injunctions in effect (the modified judgment operative as to all other defendants, and the original injunction effective as to defendants Rohn

and Huff).[11] Thus, even though it does appear that the modifications were not of a clerical nature and that defendants Rohn and Huff were not represented at the hearing in which such modifications were approved, we conclude that the modified judgment should be affirmed as to said defendants.

The judgment is affirmed as to all defendants.

Allport, Acting P. J., and Cobey, J., concurred.

A petition for a rehearing was denied September 16, 1976, and appellants'.petitions for a hearing by the Supreme Court were denied November 18, 1976.

---

[11]If the modification were held to be beyond the court's power, the result would simply be to leave the original judgment in effect as against defendants Rohn and Huff.