[Civ. No. 24623. Fourth Dist., Div. One. Aug. 13, 1982.]

**MONROE BOUNDS et al., Plaintiffs and Appellants, v. FIGURETTES, INC., et al., Defendants and Respondents.**

**COUNSEL**

Pray, Price, Williams & Russell and William C. Price for Plaintiffs and Appellants.

Bucknum, LeVine & Smith, Daniel R. Bucknum and Jan Smith for Defendants and Respondents.

**OPINION**

**STANIFORTH, J.**—Plaintiffs Monroe and Eldra Bounds (Bounds) and Gene and Grace Hand (Hands) seek damages for fraud perpetrated

upon them by the corporate defendants Figurettes, Inc., and Susan's of California, Inc., through individual defendants Hi Hand (no relation to the plaintiffs Hands), Angela Serritella, Del Remme and other individually named codefendants (collectively called Figurettes). The fraudulent acts recited are both of the common law variety, to wit, a fraudulent inducement to enter a contractual relationship and a "per se" fraudulent operation of an "endless chain" selling scheme or a "pyramid" marketing plan in violation of Penal Code section 327 and Business and Professions Code section 17500.[1]

As a proximate result of the unlawful scheme it is charged the Hands are saddled with lingerie—bras and girdles—costing $3,261.58 of which they cannot dispose. Similarly the Bounds assert they have an unsaleable inventory—bras, girdles, gowns and see-through swimsuits—costing $51,465.99. Figurettes refuses to take back the merchandise. Other consequential damages as well as punitive damages are sought. Figurettes denies these charges.

After a lengthy nonjury trial, the court concluded the Figurettes marketing plan as operated between 1969 and 1973 was not an endless chain in violation of Penal Code section 327 nor was it an illegal pyramid scheme within the rules announced in *People* v. *Bestline Products, Inc.* (1976) 61 Cal.App.3d 879 [132 Cal.Rptr. 767]. The court also found the marketing plan did not violate Business and Professions Code section 17500, the California franchise law (Corp. Code, § 31101 et seq.), nor the California Corporate Securities Act. Bounds and Hands appeal the judgment.

---

[1]Section 327 of the Penal Code provides: "Every person who ... operates any endless chain is guilty of a misdemeanor.... '[E]ndless chain' means any scheme for the disposal or distribution of property whereby a participant pays a valuable consideration for the chance to receive compensation for introducing ... additional persons into participation in the scheme or for the chance to receive compensation when a person introduced by the participant introduces a new participant. Compensation ... does not ... include payment based upon sales made to persons who are not participants in the scheme and who are not purchasing in order to participate in the scheme."

Section 17500 of the Business and Professions Code in relevant part provides: "It is unlawful for any person, ... with intent ... to dispose of ... anything of any nature whatsoever or to induce the public to enter into any obligation relating thereto, to make ... in any ... manner or means whatever, any statement, concerning such ... property or services ... which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading.... [V]iolation ... is a misdemeanor punishable by imprisonment in the county jail not exceeding six months, or by a fine not exceeding two thousand five hundred dollars ($2,500), or by both."

FACTS

Susan's of California (Susan's) manufactures lingerie. Hi Hand and his family own all of Susan's stock. Figurettes, Inc., was incorporated as a sales organization to sell products manufactured by Susan's. Hi Hand is also the president of Figurettes, Inc., and owns 51 percent of its stock. Lingerie designer Angela Serritella is a 10 percent shareholder and vice president of Figurettes, Inc., as well as an employee of Susan's. The remaining 39 percent of the Figurettes, Inc., stock was owned by Del Remme, vice president for sales.

The Bounds applied for positions as "counselors" for Figurettes, Inc., on December 13, 1969. They purchased an original inventory for $607.89. The following February the Bounds became "senior counselors" by an inventory purchase of $5,000. The Bounds invited the Hands to a meeting at the Ambassador Hotel in Los Angeles on January 19, 1972, to learn about the Figurettes marketing plan. A month later the Hands applied for positions as "counselors" with Figurettes and purchased an inventory for $500.

New recruits begin with Figurettes by signing a contract to become a counselor for Figurettes with a required inventory purchase (minimum purchase is $300, maximum $1,000). For this the recruited counselors are provided a marketing plan which includes the right to use a trademark, service mark, trade name and local advertising. The first document signed by the Bounds and Hands recruiting them as counselors was termed a "counselor application." It contains an authorization to the "counselor" to buy Figurettes products and to sell at company determined prices ("I will sell them at said prices"). The counselor is termed an "independent contractor" not an employee or agent of Figurettes. Hidden in the body of the agreement was the requirement *"all purchases from Figurettes ... will be final...."* (Italics added.) This agreement was in force and effect during the period of time the Bounds and Hands operated on behalf of Figurettes, Inc. until June 30, 1972, when the no return policy was changed allowing "applicants" to return merchandise within "72 hours from time of delivery" to obtain a refund.[2] This change in company policy followed closely upon notification

---

[2]The notice to the counselors stated: "You are aware, as well as I, that if a counselor is dissatisfied in 72 hours, you don't want him in the business anyway. This makes the prospect more aware of the solidity of Figurettes, the saleability of our products, and the fact that we are not in the business just to sell inventories. [¶] *This can be the greatest recruiting tool you have ever had.* The following statement will be on your

from the Office of the California Attorney General (Apr. 26, 1972) "[i]t appears from the program outlined in your April 17 [1972] letter that the company [Figurettes] is in violation of Penal Code section 327."

From 1969 until 1973 the Bounds and Hands were active in Figurettes directed activities. Early in 1973 they became disillusioned and withdrew from further participation. During this 3-year period the Bounds recruited some 150 persons to be counselors for Figurettes. They attended numerous meetings at which, on occasion, they personally participated in touting the Figurettes program, thus inducing others to become counselors and buy inventory in Figurettes scheme. During the years of active participation the Bounds regularly sustained losses as shown by their tax returns.[3] The Bounds never disclosed this financial experience to others coming into the Figurettes organization. When the Bounds determined they should not engage further in Figurettes activities, they took back the unsold merchandise they had sold their recruited counselors. They ended up with a lingerie inventory of $51,465.99 cost price which according to the Bounds is unsaleable.

### THE MARKETING PLAN OF FIGURETTES

The marketing plan of Figurettes is detailed in "The Figurette Counselor's Official Policy and Procedure" (Counselor's Official Policy). This document describes the multilevel marketing plan as follows:

#### Counselor Level

A counselor is defined as one who has purchased a sample inventory and has learned to fit and sell Figurettes products. The second sentence provides such counselor "may also sponsor other Counselors in the busi-

---

new application forms and will be in effect as of June 6, 1972. [¶] 'Upon the signing of this application, the applicant has purchased products costing $ _____ for cash, which products were delivered to applicant on _____ at _____ (a.m.—p.m.). It is agreed that *the applicant has 72 hours from the time of delivery of the initial inventory to return* to the recruiting counselor *for a refund* the products initially purchased which are in resaleable condition. The amount of the refund shall be equal to the applicant's cost less the suggested retail price of the portion of the products not returned.' [¶] We will have new applications available which will include the new policy by approximately the 20th of June. *If you will return all old application blanks they will be replaced to you free of charge."* (Italics added.)

[3]The substantial losses occurred in 1971 and 1972. There was little sales activity in 1973 as shown by the 1973 tax return and therefore an almost total but relatively small loss.

ness, thereby building a foundation for their future." The second paragraph of the Counselor's Official Policy fixes the original purchase at a "maximum ... totalling $1,000 ... or even $300" in order to qualify for a 5 percent bonus. The purchase is to be made at 35 percent off retail plus a 5 percent bonus for a purchase of $300 or more. A logo with *YOU* encircled at the top of a pyramid follows.[4] The diagram, by not too subtle suggestion, tells the prospective counselor that sponsoring other counselors will build up a pyramid of financial support benefiting the counselor at the top.

### Senior Counselor Level

This status is reached by the purchases either individually or through group purchase volume (PV)[5] of counselors recruited and who are in

[4]

THE MAN IN THE MIDDLE

*Whatever the mind can conceive and believe
the mind can and will achieve*

[5]PV is the retail value of all merchandise purchases less surcharge.

the pyramid below, which total $5,000 in one calendar month. These purchases are also at 35 percent off retail. When the volume reaches $5,000, a 15 percent bonus is given to this senior counselor. Out of this 15 percent the senior counselor gives up 5 percent to any counselor beneath him in the pyramid who has purchased $300 during the month. *He will still have left the guaranteed mimimum 10 percent bonus on the purchase of all counselors in his group.* The document then lists as one of his "responsibilities" the counselor must "carry a sufficient stock of merchandise to supply his people." A senior counselor may purchase $5,000 or more of merchandise and sell it all to counselers to whom he has paid a 5 percent bonus and thus retain the 10 percent difference in the bonus. This bonus is obtainable *by the sale of merchandise to counselors. There was no requirement for the sale of any merchandise at retail.*[6]

### Major Counselor Level

The third level, is that of major counselor. This status is achieved by a PV of $20,000 in a calendar month, including cumulative purchases of senior counselors. With this PV the major counselor receives a 20 percent bonus. Those in the pyramid below the major counselor who purchase less than $300 worth in a month will not receive any bonus and hence the major counselor will make 20 percent upon the amounts of such sales. Those whose purchases exceed $300 will be entitled to a 5 percent bonus paid by the major counselor. This leaves the major counselor with 15 percent or three-fourths of the bonus allowed.

Those senior counselors who have purchased merchandise worth $5,000 in a month qualify for the 15 percent bonus paid by the major counselor, leaving the major counselor with a net 5 percent of the $20,000 PV. Again, *such earnings were obtainable without a requirement for the sale of any merchandise at retail.* The mere inventory purchase by counselors and senior counselors below the major counselor in the pyramid results in a bonus to the major counselor.

Inventory purchase must be from the level of the pyramid above. A counselor must deal directly with his senior or major counselor, *"not with the home office."*[7] The counselor cannot buy merchandise from

---

[6]As we shall hereafter document, only after June of 1972 (after investigation and notification by the Attorney General of California) was there any requirement of *sales* at retail by anyone before more inventory was loaded.

[7]The senior and major counselors deal directly with the home office. "He maintains an adequate inventory of merchandise to supply his group needs." The ninth paragraph

anyone other than his sponsor. Each sales person is to recruit and sponsor other sales persons who in turn will be his customers at wholesale and purchase from him alone.

The document encourages recruiting by a variety of provisos. The counselor has the exclusive right to sell to his recruits. The rule is that "the person who first contacts" (defined as a personal visit, a telephone call or letter) a prospective customer or counselor "has the exclusive right to sell to or sponsor this person for thirty days." The exclusive right to sell to that contact is not continued after the 30 days, thus more recruiting is necessary. "The right to sponsor other people in the business is a privilege. To have this privilege, one must be a Figurette Counselor in good standing. If one sponsors other people and does not fulfill the sponsorship and requirements, *that is, carrying an adequate inventory of merchandise and supplies*, holding sales and training meetings, paying bonuses on time, etc., they shall lose their sponsorship rights."

The entire "Counselor's Official Policy" document is bereft of any requirement of retail sales by anyone. Only one sentence advises the counselors to "[b]e courteous and prompt in handling complaints as well as orders and follow up on all sales to make sure you have a satisfied customer."

Plaintiffs further demonstrate the pyramid scheme in the senior major syllabus, a document aimed primarily at the major and senior counselors. The document is consistent with the "Counselor's Official Policy." It deals with sponsoring, marketing and meetings and is designed to help in the conduct of "opportunity meetings." This document lacks any provision against inventory loading; *there is no provision for buy-back of any inventory. There is no requirement that any inventory be sold at retail.* The document forcefully brings to the attention of senior counselors an automobile, a new Mercury, which can be obtained by purchasing $5,000 PV for two months in a row. If the quota is not met "counselor pays lease payment for that month."[8]

---

of page 2 implements the pyramid concept with the instruction "Direct all questions, letters and inquiries, as well as orders and returns, to your Senior or Major Counselor. Your sponsor has most of the answers or he wouldn't be in his position."

[8]This particular inducement to become a senior counselor by the process of securing more counselors proved disastrous in the case of the Bounds. When they reached saturation in the number of counselors who could fit and sell bras, their ability to maintain the $5,000 per month PV was unattainable and they could not keep the car cost free except by borrowing. This they did to their sorrow.

The senior major syllabus urges inventory purchase. "A reserve inventory sufficient to supply a group for one or two months should be maintained." The document further states:

"C. *There may be times when you will want to buy additional product at the end of the month to qualify for over rides, car, bonuses, etc.*

"1. *You can never go wrong by purchasing product*

"2. All business people purchase when they can get the best discount

"a. At end of each month figure P.V. you are at

"b. Then figure it if you need more P.V. to qualify for other income

"c. Figure difference in your income and how much cash it would require to purchase enough product to make your qualification

"3. Wealth is product inventory and liquid assets

"a. Product inventory makes more money

"b. To earn wealth cash must be invested and an income taken from return on investment.

"c. Inventory can return you as much as 65¢ on the dollar.

"4. This is thinking as the business person that you are and running your business as a business."

In early 1972 the California Attorney General commenced an investigation of Figurettes. In the Attorney General's letter of April 26, 1972, he said: "If we receive information that additional presentations similar to those indicated in the syllabus and in your letter are being made in California, *we will have no choice but to bring appropriate action.*" Only after this letter did Figurettes impose a requirement for verified proof of retail sales of at least 20 percent of group PV for senior counselors. The Attorney General said: "It does appear that a participant in the program could very easily obtain large sums of money without a single product ever reaching the ultimate consumer. It may well be that the products are actually sold to the consumer but that does not affect the legality of the program." Figurettes made a further oblique answer

to the Attorney General's concern about retail sales by creating awards (Golden Girl) for counselors who made a minimum of $1,000 sales at retail in a single month. The award required sales slips to prove the fact of retail sales. The requirement of retail sales and the limited 72-hour buy-back offer came only in response to the Attorney General's prodding and after the Bounds and the Hands had sustained substantial losses.

## The Opportunity Meeting

What occurred at the opportunity (recruiting) meetings is difficult to believe and harder to portray in words. The intensity of the appeal to greed, however, seeps through, bursting the bonds of dry verbiage. The flavor of a meeting is described by an actual participant, counselor Martha Frary, who said: "They were showing all of the checks they were making and all of this money that they were making and how great the whole thing was and exciting.

"[W]e brought some of our people—had some of our friends come, and they got excited.... It was the greatest thing that ever came around the pipe [sic]." The Frarys then bought an inventory and for about two months "we had most all of the meetings that were held in the McIntire Group held in our home. [¶] We brought in a lot of our friends and a lot of people in there, and they became excited and came into the business." After purchase of sufficient inventory the Frarys received a car, "lease free." The Frarys parked this new car in the driveway and told all their neighbors:

"'This is the car we got for free.'

"Well, of course, you know this was a great selling point, and we just started recruiting really fantastic then because people were seeing the actual car.

"The interesting part was we were never told that the car wasn't for free." Frary said: "If they told us to do this, we would do it. If they told us to go out and buy new clothes, we went out and bought new clothes."

"When we didn't have enough money to buy inventory, they said 'Go out and borrow.' We borrowed from every place in town until we couldn't borrow. We went to loan companies, to the bank, and we even borrowed quite a large sum from a loan shark who ended up charging

us twice what we borrowed, on our house." By 1972 the Frarys had seen enough. "People were losing their homes, going into debt, all of this. We just got ourselves out."

During the Frarys' association with Figurettes there was a change in the method of fitting bras. This change resulted in obsolete inventory. Said Mrs. Frary: "[We] were buying inventory to fit the way you that were taught to fit, in a very tight one.... [T]he smaller band sizes were obsolete almost. You didn't fit in these smaller sizes." Figurettes would not take back the unusable inventory. The Frarys also borrowed and bought some $2,500 worth of bathing suits they did not sell. As the result of borrowing on their house to purchase inventory "We lost our home."

Kathy Askew tells a similar story. She describes an opportunity meeting in Mission Valley: "Okay. The meeting got off to sort of a shocking start because the man in front shouted out, 'How do you feel?' and all the people there screamed back at him, 'Never felt better, never had more.'

"Then he screamed back, 'What are you in the business for?' They all screamed back, 'To make money.'

"I was about ready to leave. Then we stayed to see what was going on."

She described individual success tales, "rags to riches" stories, interspersed with philosophy from a book called "Count to Four." "The whole meeting was very enthusiastic. The more he talked, the more enthusiastic the meeting got. [H]e would say something and there would be a lot of response from the audience, a lot of very enthusiastic answering back ...." The philosophy of the marketing plan was explained with the great emphasis on recruiting, earning a free car, retiring in three to five years and laying on a beach in Hawaii with the checks "rolling in."

At other meetings Mrs. Askew described the "Count to Four" philosophy in the marketing plan: "But this time it would be interspersed with handing out bonus checks. [W]hen the person...called out a name or a group, this group of people would stand up. They would run. This is a big room, and they would run across the floor and run up on the stage and stomp their feet and, what appeared to me, to look very excited."

The meetings usually lasted several hours and followed a script prepared by Figurettes. The meetings were run in a peppy manner with continued shouting, audience response, laughter, and singing. Film clips were shown. By not too cleverly hidden innuendo, prospects were led to believe if they became a counselor they could earn large sums by doing essentially nothing. Witnesses describe, without contradiction, the enormous peer pressure, coupled with visions of quick wealth and a total silence about any negative aspects of a chain sales scheme.

Vice president and super salesman Del Remme was prominent and present at most regional or national meetings. He flew about the country in a purple airplane. He talked for hours to groups urging greater participation through inventory purchase to acquire greater status in the multilevel sales organization. The participants were urged to "borrow if necessary" to gain the next higher level, "Load up on inventory," "Inventory can't hurt you."

*The nature and extent of the California Attorney General's charges and inquiries about the scheme, factual requisites needed to receive a "bonus," borrowing to increase "PV," costs of bringing prospects to meetings paid by the recruiter, were not topics of discussion at these meetings. The inherent limitations of any plan requiring a "chain" type of activity to achieve financial awards were never explained to the guests at the opportunity meetings.*

The cold transcripts of the meetings support the description given by various witnesses of group pressures used to induce a person to become counselors.[9]

The court (upon motion made at trial of plaintiffs' case (Code Civ. Proc., § 631.8)) said: "But the marketing plan as presented, it seems to me, did definitely encourage and indeed require, on this state of the evidence, an individual to *recruit, recruit, recruit, in order to achieve the income levels promised; ...* as a part of that recruiting, a counselor would tell the new recruit that you can achieve the income level promised by recruiting, recruiting, recruiting. *The sales of a particular bra*

---

[9]For a further and detailed description of the techniques used in "headhunting" for counselors see note, *Dare to be Great, Inc.!: A Case Study of Pyramid Sales Plan Regulation* (1972) 33 Ohio L.J., 676; see also the description of the "opportunity meetings" in *People* v. *Bestline Products, Inc., supra,* 61 Cal.App.3d 879, 888, 890; *Lefkowitz* v. *Bull Investment Group, Inc.* (1974) 46 App.Div.2d 25 [360 N.Y.S.2d 488, 493].

*or garment was really designed as a tool to recruit new individuals and cause them to buy inventory* and, further, that the scheme for bonuses and discounts encouraged recruiting without regard to the actual sales of the product to the consumer." (Italics added.) These significant factual conclusions are not negated in any way by the findings of fact ultimately made by the court.

### Retail Sales

The three documents describing the marketing plan spell out no retail sales requirement. (The senior major syllabus does require sales tax collection.) In August 1972 Figurettes announced a requirement of retail sales (20 percent to attain advanced levels) and Golden Girl awards for retail sales were offered. Figurettes actual retail sales figure was never produced. There was evidence at trial of retail sales by a number of different people including the Bounds and Hands. However, the fraction so sold was a very small percent of the total PV bought by counselors or senior or major counselors.

One publicized recruit was George Mora, a barber, who testified he became a Figurettes counselor by purchasing the minimum inventory for $350 but "within the first week I bought enough inventory to become a senior counselor ...." Had he sold any merchandise at retail? He answered "I did not." He could not, as a man, personally fit and sell bras and his wife was completely against the business. He did, however, *recruit* other counselors and achieve the next level, major counselor. By sponsoring recruits and by borrowing he attained the $20,000 PV required. Another nonseller was a bachelor who became a senior counselor within 30 days and a major by purchasing $20,000 PV within the next month. A 14-year-old boy became a senior counselor by working with his mother.

The leaders at the very top of the pyramid were Mr. and Mrs. McIntire. Mr. McIntire conceded, concerning personal retail sales, "I didn't make bra sales." Mrs. McIntire testified 1973 was their best year. They grossed some $31,000, of which $3,193 involved retail sales. This was also the Bounds' experience. They sold very little at retail.

Another key witness was Virginia Stark who at one time in her career had 3,000 to 4,000 counselors. During a two-year period she had a net profit exceeding $1,000 per month—with the aid of the 3,000 to 4,000 counselors upon whose sales she was receiving a bonus.

More significantly, during the time the Bounds and the Hands had substantial connection with Figurettes, there was no *requirement* for verification of retail sales. Only in the latter part of 1972 was any requirement of *verified retail* sales coupled with attaining a higher level of achievement.

By letter dated February 7, 1973, the Attorney General requested details of the *"manner in which the majority of your sales are made to the public ... please approximate the percentage of each [specie of sale]."* (Italics added.) This question was not answered in the lengthy, unresponsive reply given by Figurettes attorney. Nor were such facts tendered as part of Figurettes defense at trial.

The trial court finding (34) the Figurette marketing plan did rely upon retail sales of participants and those in their own personal group is supported by substantial evidence. However, *the fact of retail sales does not prevent the illegality of the pyramid portion of the sales scheme.* The Attorney General construed the facts and the code section in question and notified Figurettes: "It does appear that a participant in the program could very easily obtain large sums of money without a single product ever reaching the ultimate consumer. *It may well be that products are actually sold to the consumer but that does not affect the legality of the program."*

DISCUSSION

I

■ Based upon the foregoing uncontradicted evidence, the plain language of the documents and the precise language of Penal Code section 327, the Bounds and the Hands contend the Figurettes marketing scheme is illegal as a matter of law and they have been damaged by the operation of the scheme. They were entitled to rescind their contract and compel Figurettes to take back merchandise and be assessed all consequential as well as punitive damages.

In contrast Figurettes perceives this appeal as an attack on the substantial evidence rule. Figurettes asserts that extrinsic evidence was used to ascertain the meaning of the marketing plan and therefore this appellate court may not review the documents and independently determine their meaning. In short they assert substantial evidence supports the trial court's interpretation of the documents and therefore its judgment may not be disturbed on appeal.

In *Scott* v. *Sun-Maid Raisin Growers Assn.* (1936), 13 Cal.App.2d 353, 359 [57 P.2d 148], the court stated: "When the meaning of the language of a contract is uncertain or doubtful and parol evidence is introduced in aid of its interpretation, *the question of its meaning is one of fact ....*" (Italics added; see also *Thomson* v. *Leak* (1933), 135 Cal.App. 544, 548 [27 P.2d 795]; *Walsh* v. *Walsh* (1941), 18 Cal.2d 439, 444 [116 P.2d 62].) ■ And when the charge is made of lack of substantial evidence to support a contested factual finding, the duty of the appellate court is limited to determining whether substantial evidence supports the challenged finding. (*Crawford* v. *Southern Pacific Co.* (1935), 3 Cal.2d 427, 429 [45 P.2d 183].)

However, the foregoing rules do not compel affirmance of the trial court judgment here. Extrinsic evidence concerning the role of *retail sales* in Figurettes overall marketing program was the subject of much testimony from which conflicting inferences could be drawn. However, conceding the fact of retail sales does not remove the taint of illegality from a pyramid scheme if it is in fact in violation of California statute. Furthermore, whether there were retail sales, in fact or anticipated, was not relevant in interpreting the plain language of the marketing plan.

■ Where there is no factual dispute or where extrinsic evidence is lacking or the quantum or quality of it does not, in reason, place the trial judge in a better position to form an accurate interpretation of the writings, the appellate court is not bound by the trial court's ruling but must give the writing its own independent analysis and interpretation. In other words, where interpretation is essentially a question of law rather than of fact an appellate court is not bound by the determination of the trial court. (See *Parsons* v. *Bristol Development Co.* (1965), 62 Cal.2d 861, 865, 866 [44 Cal.Rptr. 767, 402 P.2d 839]; *Los Banos Gravel Co.* v. *Freeman* (1976), 58 Cal.App.3d 785, 792 [130 Cal.Rptr. 180]; *Estate of Shannon* (1965), 231 Cal.App.2d 886, 890-891 [42 Cal.Rptr. 278].)

## II

■ The documents and the factual evidence before the trial court without dispute demonstrate two critical facts. The plan involves "headhunting" and "inventory loading."[10]

---

[10]A marketing plan which requires a person seeking to become a distributor to pay a large sum of money either as an entry fee ("headhunting" fee) or for the purchase of a substantial amount of nonreturnable inventory ("inventory loading") is a characteriza-

Concerning these two areas, the trial court said (ruling on a Code Civ. Proc., § 631.8 motion made at the close of plaintiffs' case) nothing in the evidence before the trial court indicates other than extensive operation aimed at "recruiting, recruiting, recruiting." Recruits were urged to earn money by securing additional recruits. The Figurettes plan encouraged its distributors to sponsor new counselors, new recruits and to load up on more inventory as a means to greater financial reward. When the Bounds and the Hands became counselors in 1969— and up until late 1972—counselors were not required to sell any of the merchandise to retail customers. Nor were the counselors, senior counselors or major counselors required to in any way certify that any of the products purchased by them during the month had been resold by them or others at retail. Furthermore, there was an absolute bar against the counselors returning unsold inventory. There was no provision to buy-back inventory from any of the counselors until late 1972 when in hurried response to the California Attorney General's charges, Figurettes instituted a *72-hour from delivery* buy-back provision from "applicants"—but not counselors, seniors or majors. It is without dispute: representations of easy money were piled upon representations of more easy money, coupled with highly emotional, high pressured appeals to greed. There were blandishments heaped upon visions of large monthly incomes, a prestigious "free" automobile, early retirement and continued large receipts flowing to the faithful followers of the Figurettes plan. These promised rewards could only descend upon the participants in the pyramid if its base—new recruits—continued to grow in ever expanding numbers. The grim specter of inevitable failure was not mentioned. It is in light of these uncontradicted facts we interpret the documents.

### III

The trial court determined the Figurettes marketing plan was not a violation of California statutory law as interpreted in *People* v. *Bestline Products, Inc., supra*, 61 Cal.App.3d 879. In *Bestline* the appeal court affirmed a permanent injunction prohibiting a pyramid marketing scheme similar to the Figurettes plan and required restitution to the victims plus civil penalties.

Bestline's business consisted of marketing household cleaning products. Prospective participants were recruited by Bestline distributors.

---

tion of an illegal pyramid scheme. (*In re Koskot Interplanetary, Inc.* 86 F.T.C. 1106, 1179-1180, affd. *sub. nom.* Turner v. F.T.C. (D.C. Cir. 1978) 580 F.2d 701; see also, note, *Dare to be Great, Inc.!: A Case Study of Pyramid Sales Plan Regulation, supra*, 33 Ohio State L.J. 676.)

Distributors were divided into three categories. "Local" distributors made direct sales to the consuming public and purchased inventories from "direct" or "general" distributors. Local distributors bought products at a 35 percent discount below retail cost and received a rebate based on PV. A direct distributor purchased products from Bestline and sold them to either local distributors or to the public. Direct distributors received a larger discount on inventory purchased and rebates according to volume. There were two ways to become a direct distributor: first, through a monthly PV of $5,000; and second, through an inventory purchase of $3,000 or more.

A general distributor purchased Bestline products for a 60 percent discount. To become a general distributor a direct distributor had to recruit a new direct distributor or create an additional monthly PV of $5,000.

The trial court found the Bestline marketing plan constituted an illegal chain scheme prohibited by Business and Professions Code section 17500. The Court of Appeal agreed, finding the scheme inherently fraudulent.

The Bestline plan was similar to Figurettes in that Bestline's marketing program offered "prospective distributors the expectation of a large annual income as a result of their recruiting additional distributors who would in like fashion bring in further recruits." (*Id.*, at p. 885.) In *Bestline* as in the Figurettes plan "opportunity meetings" were frequently held. The "golden opportunities" flowing from participation in Bestline programs were described. Bestline like Figurettes was a multilevel sales scheme. Each had three levels of distributorship. Bestline's emotional appeal to "growth to greatness" was not unlike the philosophy expounded at Figurettes meetings.

The *Bestline* court concluded (after review of out-of-state decisions): "The vice of the chain system aspect of the Bestline marketing system upon which the first cause of action was in part based was the inherent deceptiveness .... Since the promised rewards can only result to any level of participants in the pyramid in the event it grows to another level, *it is obvious that ultimately the point will be reached where the necessary further recruitment is impossible.*" (*Id.*, at p. 914; italics added.)

The *Bestline* court pointed out that the plan "*offered compensation for recruitment based upon sales to the recruits. This element of the*

*Bestline plan, which is what makes it a chain scheme under California law, serves to increase the certainty of deception by diverting the efforts of all distributors from retail sales to the sales of distributorships.*" (*Ibid.*; italics added.) The court held that the Bestline program was thereby rendered per se deceptive under the policies embodied in the law of this state. (*Id.*, at p. 915.)

Figurettes claims *Bestline* is not controlling, arguing the finding of a violation of Penal Code section 327 was not necessary to the *Bestline* holding. The Penal Code section 327 violation alleged in the Bestline complaint was dismissed. The appeal court, however, held the issue as to whether the marketing plan was a chain scheme as defined in section 327 was properly tried under allegations of violation of section 17500 of the Business and Professions Code. The court reasoned because section 17500 prohibited a *wider* number of deceptive practices, proof of the Penal Code section 327 chain scheme was a necessary element to bring the conduct within the proscription of section 17500.

Figurettes also attempts to distinguish *Bestline* by pointing to the importance of retail sales to Figurettes. Extensive evidence and testimony was offered by Figurettes as to retail sales volume and the training offered to counselors for retail sales techniques including product fitting and care. However, retail sales do not legalize the pyramid marketing scheme which violates Penal Code section 327. The plan becomes illegal because it is part of the overall marketing plan which depends upon an endless chain of middlemen. ■ As the *Bestline* court carefully pointed out (at p. 914): "A pyramid sales plan under which the compensation for recruitment is limited to 'payment based upon sales made to persons who are not participants in the scheme and who are not purchasing in order to participate in the scheme,' does not come within the definition of endless chain schemes set forth in Penal Code section 327. *The section, however, declares the policy of this state that such schemes are deceptive when compensation is offered 'for introducing one or more additional persons into participation in the scheme' based upon sale to the person introduced.* It is on the basis of this policy that participation in such schemes is made criminal."

As the *Amway* decision (*infra*) states: "[T]he fact that some retail sales occur does not mitigate the unlawful nature of the method of recruiting. [Citation]." (*In the Matter of Amway Corporation* (June 23, 1978) Federal Trade Commission Docket No. 9023, Initial Decision, p. 107 [*Amway* decision]).

## IV

The *Bestline* conclusion of "per se" illegality or "inherently fraudulent" nature of the pyramid marketing scheme has been adopted by the appellate courts of several states and by numerous federal appellate courts. In *Wesware, Incorporated v. State* (Tex.Civ.App. 1972) 488 S.W.2d 844, 847, the Texas court concluded "the marketing plan of Appellant is a chain-referral or pyramid selling scheme which is inherently fraudulent, unworkable, and patently impossible, and, hence, deceptive per se . . . ." The Texas court said: "The plan or scheme before us contemplates pyramiding one group of sales upon others in a manner that has been roundly condemned and held illegal by both the federal and state courts." (*Id.*, at p. 848; see *S.E.C. v. Howey Co.* (1946) 328 U.S. 293 [90 L.Ed 1244, 66 S.Ct. 1100, 163 A.L.R. 1043]; *State by Lefkowitz v. ITM, Inc.* (1966) 62 Misc.2d 397 [275 N.Y.S.2d 303], *State ex rel. Turner v. Koscot Interplanetary, Inc.* (Iowa 1971) 191 N.W.2d 624.) "The scheme has also been called a 'referral sales' plan and consequently proscribed as fraudulent conduct." (*Wesware, supra*, 488 S.W.2d at p. 848.) In *Turner* numerous cases were cited in support of the proposition that the fact the first few participants could possibly earn something is immaterial because ultimately the plan will be impossible as a practical matter for a great majority of the public. In *Turner* the court continued, saying: "Although the term 'fraudulent conduct' is not subject to a precise definition, it does include 'referral' or 'pyramid' sales arrangements by which people are induced to buy upon the representation they can reduce or recover their purchase price, or earn untold profits by referring other buying prospects to the seller." (P. 630.)

The New York Supreme Court in *State by Lefkowitz v. ITM, Inc., supra*, 275 N.Y.S.2d 303, 315, said: "This is the vice and quicksand nature of 'endless-chain' transactions. And it is so apparent that the promoters must be charged with knowledge of the fraud inherent in it. . . . [¶] While the futility of the 'endless-chain' plan is obvious to the promoters, it is not apparent to the consumer participant. That enrollment within the first four rounds can earn commissions is entirely possible and credible."

## V

█ Figurettes contends the decision in *Amway* exonerates, legalizes, their marketing plan.

The administrative law judge found the Amway marketing plan was not an illegal pyramid plan despite encouragement to recruit new distributors. The Amway marketing plan survived close scrutiny because of certain safeguards incorporated in the plan which prevented inventory loading. However, *none of the Amway safeguards are to be found in the Bestline or the Figurettes plan.*

The *Amway* judge said: "Some promoters posing as direct selling companies have rewarded recruiting itself in 'pyramid' plans, involving 'headhunting' and 'inventory loading.' Recruits earn money by securing further recruits, and there are few product sales to consumers. In order to recruit an effective sales force, Amway encourages its distributors to sponsor new distributors. This is not, however, a pyramid plan. In the Amway system, the incentive to recruit comes from the commission distributors receive on product sales by sponsored distributors in their organizations. But, by several rules, Amway requires that commissions are not paid unless the products are sold to consumers. Distributors must each sell to ten retail customers every month; the distributors must certify that 70% of the products purchased by them during the month have been resold; and inventory loading is further deterred by a rule requiring distributors to buy back the inventory of any of their sponsored distributors leaving the business." (*Amway* decision, at p. 75.)

The administrative law judge continued, saying: "There is little doubt that a pyramid distribution scheme should now be condemned even without the demonstration of its economic consequences. The Commission has studied the effects of such 'enterpreneurial chains' and seen the damage they do and a *per se* rule should be used. (*Koscot Interplanetary, Inc.*, 86 F.T.C. 1106, 1180-82 (1975). Such a rule would be based on demonstrated economic effect in these cases, rather than formalistic line drawing. *Continental T.V. Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 59 (1977). In such cases, the fact that some retail sales occur does not mitigate the unlawful nature of the method of recruiting. *Ger-Ro-Mar, Inc.*, 84 F.T.C. 95, 148-49 (1974), *rev'd on other grounds*, 518 F.2d 33 (2d Cir. 1975). Here, however, the Amway system does not involve an 'investment' in inventory by a new distributor. (Finding 61) A kit of sales literature costing only $15.60 is the only requisite. (Finding 34) And that amount will be returned if the distributor decides to leave Amway. (Finding 37)" (*Amway* decision, at p. 107.)

The administrative law judge concluded that *Amway* had avoided the abuses of a pyramid scheme by (1) not having a headhunting fee (as in *Bestline* and Figurettes), (2) making product sales a precondition for receiving the performance bonus (not found in *Bestline* or Figurettes), (3) buying back unsold inventory (not found in the Figurettes program), and (4) requiring a substantial percentage of products be sold to consumers at retail (not found in either *Bestline* or Figurettes).

*"Amway's buy-back, 70% and ten customer rules deter unlawful inventory loading."* (*Amway* decision, p. 107.) Therefore, the judge concluded *"Amway is not in business to sell distributorships and is not a pyramid distribution scheme."* (*Amway* decision, at p. 108.)

We conclude, based upon our independent review of exhibits 6, 7 and 11—found by the trial court to constitute the Figurettes marketing plan—and upon the uncontradicted factual matters recited above, the trial court erred in its legal conclusion the Figurettes marketing plan was not a deceptive business practice within the meaning of Business and Professions Code section 17500 and an illegal chain scheme contrary to section 327 of the Penal Code.[11]

Judgment reversed with direction to the trial court to enter a judgment of liability as to both corporate defendants and Figurettes corporate officers and authorization for further proceedings on the damages issues only. (Civ. Code, §§ 3343, 3333; *Hartong v. Partake, Inc.* (1968), 266 Cal.App.2d 942, 968-969 [72 Cal.Rptr. 722]; *People v. Bestline Products, Inc., supra,* 61 Cal.App.3d at pp. 919, 922.)

Cologne, Acting P. J., and Work, J., concurred.

A petition for a rehearing was denied September 8, 1982, and respondents' petition for a hearing by the Supreme Court was denied October 20, 1982.

---

[11]In view of our finding of illegality of the merchandising scheme in violation of Business and Professions Code section 17500 and Penal Code section 327, it is unnecessary to examine the contention that the scheme also violates the Corporations Code section 31300 prohibiting persons from offering or selling a franchise in violation of section 31110 of the Corporations Code because Figurettes was not registered under the franchise investment law.