725 P.2d 727

**STATE of Arizona, ex rel. Robert K. CORBIN, Attorney General and the Arizona Corporation Commission, Plaintiffs-Appellees,**

**v.**

**CHALLENGE, INC., a Nevada corporation, aka Challenge Academy, Inc.; Edward G. Rector; and Alan Kent Oakes, Defendants-Appellants.**

**No. 1 CA–CIV 7435.**

Court of Appeals of Arizona, Division 1, Department A.

March 20, 1986.

Reconsideration Denied May 8, 1986.

Review Denied Sept. 24, 1986.

---

Robert K. Corbin, Atty. Gen., Patrick M. Murphy, Chief Counsel, Financial Fraud Div. by W. Mark Sendrow, Asst. Atty. Gen., Phoenix, for plaintiffs-appellees.

Paul G. Ulrich, P.C. by Paul G. Ulrich, Phoenix, for defendants-appellants.

## OPINION

BROOKS, Judge.

This is an appeal from a judgment in a consumer fraud action entered after the granting of the state's motion for partial summary judgment. The judgment, which included extensive findings of fact and conclusions of law, found defendants liable for numerous violations of the Arizona Con-

sumer Fraud Act, A.R.S. § 44–1522(A).[1] The judgment granted injunctive relief and awarded an amount in excess of $2.5 million for civil penalties, restitution, costs and attorney's fees. The appeal presents for our consideration the following issues: (1) whether there were substantial issues of material fact that should have precluded the granting of partial summary judgment; (2) given the substantial dispute as to the facts, whether the trial court could properly have held as a matter of law that Challenge, Inc.'s, marketing program was a "pyramid promotional scheme" in violation of A.R.S. § 44–1731 or otherwise constituted a deceptive practice under A.R.S. § 44–1522(A); and (3) whether the relief accorded in the judgment was appropriate given the state of the record.

## FACTS AND PROCEDURAL BACKGROUND

Viewed in the light most favorable to appellants, *Grain Dealers Mutual Ins. Co. v. James*, 118 Ariz. 116, 575 P.2d 315 (1978), the facts necessary for our resolution of the issues are as follows. Appellant Challenge, Inc. (Challenge), was formed in April of 1979. Richard Mailman, Douglas Beekman, Appellant Edward Rector and Appellant Alan Oakes organized the company. They were assisted in doing so by Glen W. Turner, who had formerly employed all of them. Rector owned all of the shares of Challenge's corporate stock and was the chairman of its board of directors. Beekman was the corporate president, Oakes was vice-president of field operations, and all served as members of the board of directors.

Challenge's business was centered around conducting motivational courses

---

1. **§ 44–1522. Unlawful practices; intended interpretation of provisions**

    A. The act, use, or employment by any person of any deception, deceptive act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not

    any person has in fact been misled, deceived, or damaged thereby, is declared to be an unlawful practice.

    B. It is the intent of the legislature that, in construing the provisions of subsection A of this section, that the courts may use as a guide interpretations given by the federal trade commission and the federal courts to §§ 45, 52 and 55(a)(1) Title 15, U.S.C.A. of the Federal Trade Commission Act.

and the selling and recruiting of persons to sell those courses. Among the courses offered was the "Adventure Series." This series of four courses consisted of 90 hours of instruction in connection with which various sets of tape recordings, written materials and phonograph records were supplied. The four Adventure Series courses sold for $5,000. The Adventure Series was developed by Glenn W. Turner, and Challenge used it with his permission.

Challenge developed and expanded its sales force through what it called "Shooting Star Seminars" and "Monday Workshops." The *Challenge to America Fact Sheet* described the Shooting Star Seminar as being "for the new Sales Trainee and for the customer who is considering purchasing our courses." It was, as a practical matter, impossible to become involved in the Challenge marketing program without attending a Shooting Star Seminar, because the leadership discouraged its sales people from disclosing information about the program when "prospecting" for candidates. At the Shooting Star Seminars, Challenge personnel induced "prospects" to become "sales trainees" using a sales recruitment script developed for that purpose. The script was delivered with great fervor. Previously-recruited sales trainees and "independent sales agents" participated vociferously.

The Challenge multilevel marketing plan was explained to "prospects" as follows. Sales Trainees, the first level, earned a twenty percent commission on any sales of courses which they made to themselves or to persons outside the Challenge organization, but they could not earn commissions on sales by other sales trainees. Purchase of the course by the sales trainee was not required. The only requirement for this level was to be sponsored by an independent sales agent. Sales trainees were encouraged to become independent sales agents, the second level, because they earned the highest commissions: fifty percent commissions on their own sales and thirty percent commissions on sales made by "their" sales trainee. A sales trainee could become an independent sales agent

by: (1) selling $5,000.00 worth of courses; (2) being approved by the sponsoring independent sales agent; (3) paying for and attending a special independent sales agent workshop at a cost of up to $375.00; and (4) recruiting two additional sales trainees.

It was undisputed that the Adventure Series courses were only rarely sold to persons who were not Challenge sales trainees. As of August 1, 1980, Challenge had sold 4,908 courses in the United States. Only 84 were sold to persons outside the organization. Further, it was undisputed that every known independent sales agent in Arizona had purchased the courses in order to satisfy the $5,000.00 sales requirement. One affidavit submitted in support of the state's motion for partial summary judgment stated that sales trainees were told that the only way a sales trainee could prove he was not in the program just to make money was to purchase the courses himself. Another stated that sales trainees were told it would be difficult to sell the courses if they had not purchased them themselves, and that without taking the courses, sales trainees would not understand what was going on.

Another stated:

[At a Liftoff Workshop, it was explained that] it's easier to sell the courses if you have purchased them yourself; that all you have to do is get people to come to the meetings and they will purchase the courses and you will earn commissions from them. They emphasized that it was very important for everyone to purchase the courses if you wanted to be involved in the Challenge program.

Still another stated:

That although the leadership ... say that you do not have to buy the Adventure Series courses in order to sell them, everyone is told that "how can you sell them without buying them yourself." Anyone who attempted to remain a sales trainee without buying the course was ostracized from the program. A lot of peer pressure and pressure from the leadership was put on persons to pur-

chase the courses. If one did not express an interest in purchasing the Adventure Series courses which at the time cost $4,600 for the courses and $400 for a promotional package, it was as a practical matter impossible to remain active in the Challenge marketing plan. The leadership was simply not interested in persons who refused to purchase the Adventure Series courses.

Another affiant noted:

That it was practically impossible to sell $5,000 worth of courses to anyone else for several reasons. The requirements to become an ISA had to become satisfied within 60 days. You would not want to sell courses at retail outside the organization because big money supposedly could be made by recruiting other people as your sales agents. If you wanted to recruit people as your sales agents, you would have to bring them to a Shooting Star Seminar at which time they would learn about the money-making opportunity themselves. They would also learn that they could earn a 20 percent commission on purchasing the Adventure Series courses themselves. At that point, they would not want to spend $5,000 for the four courses they could purchase for $4,000, plus the opportunity to earn more money.

In addition to attending Shooting Star Seminars, sales trainees also attended a "Monday Workshop" as part of their introduction to the Challenge marketing program. At the Monday Workshop, Challenge personnel taught new sales trainees to recruit "prospects" in the same way they had been recruited. In "prospecting," sales trainees were to ask prospects whether it would be worth $130 (the cost of attending the seminar and workshop) and two days of their time to learn about a way to earn $1,000 to $3,000 a month for part-time work. Sales trainees were instructed to behave as if they were successful and to display enthusiasm concerning the money-making program, but not to give out any details about it. These sales trainees' objective was to get the prospect and his or her spouse, if any, to attend a Shooting Star Seminar and Monday Workshop, where the prospects' own enthusiasm for the idea of earning considerable amounts of money could be "jacked up," and the prospects could be sold on becoming sales trainees and working toward becoming independent sales agents. It was through new prospects' participation in the marketing program that existing sales trainees met their requirements for becoming independent sales agents themselves.

One affidavit in support of the motion for summary judgment, from a person who became active in the Challenge marketing program, stated that recruitment of prospects was much more difficult than the Challenge leaders suggested that it would be. Another affiant stated that Challenge personnel told sales trainees that they could tell prospects that they had already made $1,000 in the Challenge Program, referring to the $1,000 "commission" received on the sales trainee's own self-purchase of the Adventure Series courses.

The state brought the instant action against appellants and other defendants on September 23, 1980. After temporary and preliminary injunctive relief was granted, and numerous discovery procedures were pursued, the state moved for partial summary judgment on liability against defendants Beekman and Mailman and appellants. In a minute entry, the trial court granted the motion for partial summary judgment and ordered the state's counsel to prepare findings of fact and conclusions of law. The state did so, and also submitted a form of judgment accompanied by a supporting motion. The supporting motion argued for imposition of a $1 million civil penalty, $1,510,100 in restitution and $53,117.97 for attorney's fees, investigative expenses and other costs. These figures were supported by affidavits. Appellants filed objections to the proposed form of judgment and moved for reconsideration of the partial summary judgment. The trial court overruled the objections, denied the motion for reconsideration, and directed the state to prepare an amended judgment in accordance with certain suggestions made in the

state's response. Judgment was entered and this appeal followed.[2]

Appellants first contend that genuine issues of material facts existed which should have precluded the granting of the state's motion for partial summary judgment.

■ On appeal, we are required to take that view of the evidence which is most favorable to the party opposing the motion for summary judgment and we must give that party the benefit of all favorable inferences that may be reasonably drawn from the evidence. If, when viewed in that manner, the evidence is such that reasonable persons might reach different conclusions as to whether there is a genuine issue as to any material fact, the judgment must be reversed. *Cummings v. Prater*, 95 Ariz. 20, 386 P.2d 27 (1963).

### LEGAL ANALYSIS

The state contends that Challenge's sales marketing program is fraudulent under either or both of the following theories. (1) That Challenge's operation constitutes a "pyramid scheme" and is thus inherently deceptive. (2) That appellants misrepresented that the Challenge marketing plan involves a money-making opportunity.

This court has been presented with two standards describing the activities which constitute what is known as a "pyramid scheme." At different points in their arguments to the trial court and to this court, both parties have selectively relied upon portions of both standards, depending upon which best supports their position at a given point in their legal analysis.

First, the state primarily relies upon decisions of the Federal Trade Commission and federal case law. Its reason for doing so

arises from A.R.S. § 44–1522(B), *see* footnote 1, *supra*, which provides that in determining whether a violation of Arizona's Consumer Fraud Act has occurred, "the courts may use as a guide interpretations given by the federal trade commission and the federal courts to § 45, 52 and 55(a)(1), Title 15, U.S.C.A. of the Federal Trade Commission Act."[3]

■ Although not specifically defined nor prohibited in the Federal Act, pyramid schemes have been held by the Federal Trade Commission and the federal courts to be inherently illegal and violative of § 5 because of the great potential to deceive which is associated with such plans. Those cases have held that a pyramid scheme has the following characteristics:

· The payment by participants of money to the company in return for which they receive (1) the right to sell a product *and* (2) the right to receive in return for recruiting other participants into the program rewards which are unrelated to the sale of the product to ultimate users.

*In re Koscot Interplanetary, Inc.*, 86 F.T.C. 1106, 1180 (1975), *affirmed sub nom, Turner v. F.T.C.*, 580 F.2d 701 (D.C. Cir.1978). (Emphasis in original.) Under this standard, the state argues that Challenge's marketing plan constitutes a pyramid scheme. In the instant case, we choose to seek guidance from our legislature's own definition of a "chain or pyramid distribution scheme" contained in former A.R.S. § 44–1731[4], which provided as follows:

A. It is illegal and prohibited for any person or his or its agent or employee to promote, offer or grant participation in a chain or pyramid distributor scheme.

---

2. Beekman and Mailman separately appealed the judgment, but later moved for dismissal in this court. This court entered an order dismissing the appeal as to Beekman and Mailman on March 30, 1984.

3. Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, provides that "[u]nfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are declared unlawful."

4. Former A.R.S. § 44–1731 was repealed by Laws 1983, Ch. 38, § 2, and a new § 44–1731 was added by Laws 1983, Ch. 38, § 3. Laws 1983, Ch. 38, § 7 provides that the former version of § 44–1731 *et seq.* shall remain in effect for the purposes of any criminal prosecutions or civil actions for violations taking place before the effective date of the new version thereof.

B. In this article, a "chain distributor scheme" or a "pyramid distributor scheme" is a sales device whereby a person, upon condition that he make an investment, is granted a license or right to solicit or recruit for profit or economic gain one or more additional persons who are also granted such license or right upon condition of making an investment and may further perpetuate the chain of persons who are granted such license or right upon such condition.

C. In this article, "investment" means any acquisition, for a consideration other than personal services, of property, tangible or intangible, and includes without limitation franchises, business opportunities and services. It does not include sales demonstration equipment and materials furnished at cost for use in making sales and not for resale.

D. A limitation as to the number of persons who may participate, or the presence of additional conditions affecting eligibility for such license or right to recruit or solicit or the receipt of profits therefrom, does not change the identity of the scheme as a chain or pyramid distributor scheme.

The federal case law focuses on the participant's payment of money in return for the right to sell a product, together with the right to receive a fee for recruiting others into the program. In contrast, the former Arizona statute focused solely on the making of a *required* investment in return for the right to solicit or recruit participants into the plan. Further, under the federal standard, the proceeds received by the participant must be unrelated to the sale of the product to the ultimate consumer, thereby excluding sales commissions. However, under the former Arizona statute, any profit or economic gain realized by the participant as a result of the recruitment was sufficient.

Since our legislature has chosen to define a pyramid scheme, and the parties have conceded that the operation of such a scheme would be an unlawful practice within the meaning of A.R.S. § 44–1522[5], we find that this statute, rather than the federal case law, is the legal reference point for determining whether the Challenge program is a pyramid scheme.

Appellants do not favor us with a listing of the particular disputed issues of material fact that they contend should have precluded the entry of summary judgment. Instead, the argument portion of their opening brief states as follows:

> The statement of facts portion of this brief either sets forth or refers to numerous major fact disputes. All of these disputes were presented to the superior court. Given the record presented, the superior court was compelled to conclude that Challenge's sales marketing program and the retail sale of its courses themselves were wholly separate activities, that there were no authorized, misleading, deceptive, or false statements made as part of the sales marketing program, and that the courses themselves were well worth their price. Given the evidence presented, the superior court improperly disregarded the major factual disputes presented. Its partial summary judgment should therefore be reversed.

We have thus been required to abstract from appellants' statement of facts the particular contentions they appear to be making.

Appellants appear to contend that Appellant Edward Rector's affidavit concerning the authenticity of correspondence received from persons who attended Challenge courses or sales training meetings created a genuine issue of material fact. The letters attached to this affidavit are general testimonials by some of the persons who later executed affidavits for the state. They are almost uniformly positive, enthusiastic, complimentary and uncritical. All concern how beneficial the Challenge programs and workshops have been and how they have helped the writers in their lives. Although these letters can be read

---

5. A.R.S. § 44–1732(C), as amended effective July 23, 1982, now specifically provides that a violation of A.R.S. § 44–1731 also constitutes an unlawful practice under A.R.S. § 44–1522.

as disputing some of the more negative statements made by the participants in their later affidavits, we cannot agree that the fact issues they raise are material. The question of whether participants in Challenge programs and workshops perceived them as beneficial or valuable has no legal bearing on the issue of whether the program constitutes a pyramid scheme.

■ Appellants also urge that we must accept as true the statement contained in Edward Rector's affidavit that Challenge and its officers "have always gone to extremes to be conservative, fair, truthful and evenhanded." We cannot agree. Conclusory statements are simply insufficient to raise any genuine issues of material fact under Rule 56(e), Arizona Rules of Civil Procedure. *Madsen v. Fisk*, 5 Ariz.App. 65, 423 P.2d 141 (1967).

Appellants also appear to argue that the statement in Tim Dunaway's affidavit that he never provided a list of Adventure II course attendees to anyone but Challenge, Inc. raised a genuine issue of material fact because it inferentially disputed statements made in two affidavits submitted in support of the state's motion for summary judgment. However, the question of whether course attendee lists were given to persons outside Challenge is clearly immaterial.

Appellants also rely on Appellant Edward Rector's statement in his affidavit that the Challenge marketing program was not designed to induce sales people to buy the course Challenge offered. This is a mere conclusion which in itself is insufficient to raise any genuine issue. Further, what is material is not the purpose with which the Challenge Marketing Program was designed, but rather the actual characteristics of that program and how it operated. Mr. Rector's affidavit sheds no light on that point.

■ Appellants also contend that the record contained genuine issues of material fact which precluded the trial court from determining, as a matter of law, that Challenge's marketing plan was a pyramid scheme in violation of A.R.S. § 44–1731. We agree. As the court stated in *Morelos v. Morelos*, 129 Ariz. 354, 631 P.2d 136 (App.1981):

If there is the slightest doubt as to whether a factual issue remains in dispute, the granting of summary judgment is erroneous and such doubt must be resolved in favor of a trial on the merits, and, even if there is no factual dispute, where possible inferences to be drawn from the circumstances are conflicting, summary judgment is unwarranted.

129 Ariz. at 355, 631 P.2d at 137. *Accord Brown v. Sears, Roebuck & Co.*, 136 Ariz. 556, 667 P.2d 750 (App.1983). After reviewing this record, we are left with significant doubts with regard to whether factual issues remain in dispute on the question of whether attainment of the status of independent sales agent was "conditioned" on the self-purchase of the Adventure Series courses. The affidavit of Larry Seymour, referring to the Shooting Star Seminar presentation, states:

It was a standard part of the presentation, said at each and every meeting, that you did not have to purchase the courses in order to be a salesperson. We believe that everyone needs the courses, for themselves and their family. We feel that the people that purchase our courses are better able to handle life, business, and their relationships with others. Naturally, we suggest that everyone buy our courses but the decision is always up to them. It is my understanding that most people did not make the purchase for about a month after they became involved so I doubt that anything influenced them into buying except a lot of thought and a decision that that [sic] is what they wanted to do.

In addition, the form on which Challenge customers purchased courses recited "that the consideration herein given is solely for the purchase of the items enumerated herein and that I receive no rights whatsoever to sell either of these items for Challenge Inc. nor may I be entitled to any compensation by Challenge, Inc. for any reason.

This is solely a retail sale of merchandise." Further, a tape of "quality control interviews" of persons who went to Shooting Star Seminars revealed that each was aware they were not required to buy anything in order to sell the courses or be a sales trainee, and that buying courses did not give them the right to sell courses to others.

We emphasize that the issue before us is not whether there was evidence in the record to support the trial court's findings of fact. If that were the case, we would have little trouble in holding that there was. The issue here, however, is whether there was no genuine issue as to any material fact and whether only one inference could be drawn from the undisputed material facts, Rule 56(c), Arizona Rules of Civil Procedure. We simply cannot say that that is the case here. Because the trial court's conclusion that the Challenge marketing program constituted an unlawful pyramid scheme within A.R.S. § 44–1731 was an integral part of its decision, we hold that it was reversible error to grant summary judgment on that issue.[6] The decision of the North Carolina court in *State ex rel. Edmisten v. Challenge, Inc.*, 54 N.C. App. 513, 284 S.E.2d 333 (1981), cited by the state, does not mandate a contrary result. Unlike former A.R.S. § 44–1731, the North Carolina statute in question in that case defined a pyramid scheme as a scheme whereby a participant pays a valuable consideration for the opportunity to receive a fee or compensation upon introducing other participants into the program. The court noted:

[T]he statute is violated if an individual "pays" consideration, regardless of whether he is required to pay it. The Challenge *modus operandi* is such that it would be grossly impractical not to pay the consideration for the opportunity to participate. The evidence is uncontroverted that all participants in North Carolina who advanced in the program did so by purchasing the seminars for themselves in order to meet the $5,000 requirement to become an Independent Sales Agent.[7]

284 S.E.2d 333, 337. In contrast, former A.R.S. § 44–1731 expressly defined a pyramid scheme to include as an element thereof a specific *condition* or *requirement* that the participant make an investment in order to obtain the right to recruit other persons for economic gain. As we have previously noted, we cannot say that there is no genuine issue as to whether such a condition or requirement existed in this case. *Bounds v. Figurettes*, 135 Cal. App.3d 1, 185 Cal.Rptr. 480 (1982) and *People v. Best Line Products, Inc.*, 61 Cal. App.3d 879, 132 Cal.Rptr. 767 (1976), relied on by the state, are distinguishable for similar reasons. Finally, *SEC v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476 (9th Cir.1973) did not concern a statute prohibiting pyramid schemes.

We also find that genuine issues of material fact existed concerning whether the earnings representations made by appellants in Shooting Star Seminars were deceptive. There is no question that many of the affidavits submitted in support of the

---

**6.** It is true that one of the requirements for becoming an independent sales agent was that a sales trainee was required to attend an ISA Workshop at a cost of up to $375. This may technically constitute an "investment" within the meaning of A.R.S. § 44–1731(C), and accordingly it could be argued that the making of this investment was a "condition" upon the granting of the right to recruit additional persons for economic gain. Neither the state nor the trial court, however, treated the ISA Workshop attendance requirement as sufficient of itself to establish the Challenge marketing plan as a pyramid scheme. The central issue was, instead, whether sales trainee's accession to the status of independent sales agent was condi-

tioned on the sales trainee's self-purchase of the $5,000 Adventure Series courses.

**7.** We note that a different result might well be required in this appeal if the applicable Arizona statutory language were similar to that of North Carolina. Numerous affidavits submitted in support of the state's motion for partial summary judgment alleged, without contradiction, facts supporting the view that the Challenge marketing program was structured and conducted in Arizona such that the obvious way to meet the $5,000 sales volume requirement for becoming an independent sales agent was by self-purchase of the Adventure Series courses.

motion for partial summary judgment reported representations that could reasonably be found deceptive. For example, the affidavit of Mary Beall stated that Defendant Richard Mailman had encouraged her to borrow money with which to purchase the Challenge courses, and had stated that after six months enough money could be earned to repay the loan. The affidavit of David Mills reported that Larry Barnett and Larry Seymour of Challenge, Inc., had stated that it "wasn't too difficult" to make money. In view of other evidence presented to the trial court, however, we cannot say that the only inference to be drawn from the state's evidence was that the representations were deceptive. The Shooting Star Seminar script itself included the following statement: "Unfortunately, we find that most people will not do the work necessary to earn this kind of money, because they won't put forth the effort (write on board: MOST PEOPLE WON'T EARN THIS AMOUNT)." The Monday Workshop outline included the following statements:

(1) Don't use the word "millionaire" or "rich".

(2) Don't use the word "investment"—it does not take an investment to start with Challenge, Inc.

(3) Do not borrow money for the business opportunity—it costs nothing to become a part of Challenge, Inc. as a sales person.

\* \* \* \* \* \*

(6) Don't tell people they will earn any specific amount of money. Don't guarantee them an income. Don't tell them it is easy to earn money.

Further, the affidavit of Appellant Alan Oakes states that a $2,300 commission on the sale of one set of Adventure Series courses was attainable "with enough work." We emphasize again that the issue is not whether the record contained evidence to support the trial court's findings. The question is, instead, whether there were no genuine issues as to any material facts and whether only one inference could

be drawn from those facts. Given this record, we hold that it was inappropriate to grant summary judgment on the question of whether appellants had made or authorized deceptive statements concerning earnings to be made in the Challenge marketing program.

Because the judgment must be reversed and the matter remanded for trial, we do not reach appellants' contentions concerning the propriety of the relief provisions of the judgment.

■ Appellants have requested an award of attorney's fees on appeal pursuant to A.R.S. § 12–348 which provides that, in a civil action brought by the state, "a court shall award attorney's fees and other expenses to any party other than the state which prevails by an adjudication on the merits."

We acknowledge that a party who appeals and succeeds in reversing the trial court's entry of summary judgment may be a "successful party" on appeal and thus may be entitled to an award of attorney's fees pursuant to A.R.S. § 12–341.01.[8] That statute, however, is readily distinguishable from A.R.S. § 12–348 which *expressly* permits fees only to a party which prevails by an adjudication *on the merits.* This distinction was recently noted by our supreme court in *Wagenseller v. Scottsdale Memorial Hosp.,* 147 Ariz. 370, 710 P.2d 1025 (1985).

Appellants' request for an award of attorney's fees is denied without prejudice to their right to request an award in the event that they ultimately prevail on the merits of this action.

For the foregoing reasons, the judgment of the trial court is reversed and this matter is remanded for proceedings consistent with this opinion.

GREER, P.J., and HAIRE, J., concur.

---

8. A.R.S. § 12–341.01 provides that in "any contested action arising out of a contract, express or implied, the court may award the successful party reasonable attorney's fees."